RIDGEWOOD HOMEOWNERS
ASSOCIATION et al.

v.

David MIGNACCA et al.

Ridgewood Homeowners
Association et al.

v.

Zoning Board of Review
of Cranston et al.

No. 2001–289–M.P.

Supreme Court of Rhode Island.

Jan. 14, 2003.

Alan P. Gelfuso, Cranston, Richard Tallo, for Plaintiff.

Michael J. Lepizzera, Jr., William R. Guglietta, Providence, for Defendant.

Present: WILLIAMS, C.J., LEDERBERG, FLANDERS and GOLDBERG, JJ.

**OPINION**

LEDERBERG, Justice.

Can David and Kathy Mignacca (Mignaccas), two of the defendants in this case, keep their miniature horse on their residential property in the Ridgewood Estates subdivision in the City of Cranston? We answer in the negative. The Ridgewood

Homeowners Association and certain members of the association individually (collectively, the association or plaintiffs) sought to prevent the Mignaccas from keeping the horse on their property. The defendant Zoning Board of Review of Cranston granted a zoning variance that allowed the horse, even though the Mignaccas did not own the ten acres required by the City of Cranston Zoning Code for raising and keeping animals. The plaintiffs appealed that decision and also brought a separate action seeking to enforce a restrictive covenant that they claimed prevented the Mignaccas from sheltering the horse in Ridgewood Estates. Following the entry of judgment against the association in both the zoning appeal and the restrictive covenant action, the plaintiffs appealed and filed a petition for a writ of certiorari, which we issued. We sustain the appeal and reverse the judgment of the Superior Court in the covenant action, and we grant the petition and quash the judgment of the Superior Court in the zoning appeal.

## Facts and Procedural History

In July 2001, the Mignaccas' miniature horse, which the record sometimes refers to as "Sonny," stood thirty and one-half inches high, one or two inches less than its eventual full height. The horse was not trained for riding but was shown competitively. The Mignaccas' son, Christian, whose "therapeutic" needs led his parents to the purchase, has won numerous ribbons by showing the horse at competitions. The horse requires approximately one-quarter to one-half acre for its exercise and an outdoor shed for shelter. The Mignaccas' property consists of four acres, comprising two adjoining lots in Ridge-wood Estates, a subdivision of two-acre lots.

Concerned that the zoning code required a minimum of ten acres for them to keep their horse, the Mignaccas filed an application for a variance with the Cranston Zoning Board of Review (board) for permission to keep a miniature horse and to build and shelter the animal in a ten-foot by twelve-foot stable on their lot. They specifically sought relief from Sec. 30–8 of the City of Cranston Zoning Code (zoning code) titled Schedule of uses, under zoning code Sec. 30–28, entitled Variances. Section 30–28 requires that all applications be transmitted to the Cranston Planning Commission (commission) for its review and recommendation to the board, which then decides whether to grant the variance. On April 3, 2001, the commission issued findings of fact based on the Mignaccas' application, including a finding that the zoning code required a minimum of ten acres to keep the miniature horse. The commission "voted to make no specific recommendation" on the Mignaccas' request for a variance, however. After examining exhibits and hearing both opposing and supportive testimony on the request, on April 11, 2001, the board granted the Mignaccas a variance with conditions.

The association appealed the board's decision to the Superior Court, where plaintiffs filed a second suit seeking to enjoin the Mignaccas from keeping the horse on their land on the basis of restrictive covenants in the deeds to all the properties in Ridgewood Estates. The plaintiffs specifically argued that restrictive covenant 8 ("Livestock and Poultry") barred the Mignaccas from maintaining the horse and from building a stable on their property.[1]

1. While the suit to enjoin the Mignaccas from keeping the horse was pending, a Superior Court justice—not the trial justice—granted plaintiffs a temporary restraining order, barring the Mignaccas from keeping the horse on their premises. Concurrently, the Mignaccas

The Superior Court justice consolidated the two cases for trial on the merits. The justice, sitting without a jury, heard extensive testimony and conducted a "view" of the Mignaccas' property to observe the horse and the surrounding lots in the subdivision. Based on testimonial evidence and on the view, the association amended its complaint during trial to allege that the Mignaccas also violated Ridgewood Estates' restrictive covenants by keeping three dogs, four ducks, and two rabbits on their property, as well as a boat, a go-cart, five all-terrain vehicles, an industrial dumpster, an industrial loader, and a fence erected without the association's approval. The Mignaccas filed a counterclaim during trial, challenging the keeping of any animals by plaintiffs, other than cats and dogs. All claims were consolidated.

On July 13, 2001, the justice entered judgment on all claims, accompanied by a written decision. Addressing the zoning issue, the trial justice remanded the case to the board, directing it to declare that "because the Mignaccas have well in excess of 20,000 square feet on which to permit [their horse] to amble and graze, Cranston Ordinance 4–2.1 precludes the necessity of granting a dimensional or any other variance to the Mignaccas, as that ordinance allows the keeping of a horse, even in a built-up area, so long as the owner has more than 20,000 square feet for use as a pasture." Additionally, the justice refused to enforce any of the restrictive covenants cited in the claim, counterclaims, and plaintiffs' amended complaint. In so doing, he found that covenant 8 did not apply to the Mignaccas' horse and that the association could not enjoin the Mignaccas from keeping it because of plaintiffs' own violations of certain restrictive covenants. He declared that the Mignaccas could keep the horse on their property and complete the ten-foot by twelve-foot stable they had begun to build for housing the animal.

The plaintiffs filed a petition for issuance of a writ of certiorari with respect to the zoning decision and appealed the justice's decision not to enforce covenant 8. This Court issued the writ and consolidated the appeal with the petition. The Mignaccas have not appealed the trial justice's decision denying their counterclaim, and plaintiffs did not appeal the denial of the additional claims in their amended complaint. Pending the resolution of the dispute by this Court, we granted the association's motion for a stay of the decision, enjoining the Mignaccas from keeping the horse on their property.[2]

Additional facts will be presented in discussing the issues on appeal.

## Restrictive Covenants

The plaintiffs argued on appeal that the Superior Court justice erred in finding that the miniature horse was not barred by covenant 8, based on his finding that the covenant was ambiguous, that it was enforced arbitrarily, and that the equities of the situation did not support an injunction against the horse's presence on the Mignaccas' property. In addition to covenant 8, plaintiffs had pointed to restrictive covenants 5 ("Nuisances") and 6 ("Temporary Structures") in their suit to enjoin the keeping and maintaining of a horse on the Mignaccas' land in Ridge-

---

applied for a temporary restraining order to bar one of the plaintiffs, Rena Dressler, from keeping any animals other than two cats or two dogs in her home. A different Superior Court justice denied the Mignaccas' application.

2. The parties disclosed at oral argument that the Mignaccas have purchased a nearby farm where the horse is kept, along with additional miniature horses they subsequently acquired.

wood Estates. The three covenants are listed in the Declaration of Restrictions and Protective Covenants (declaration) that are imposed on all lots in the Ridgewood Estates subdivision. Phillips Associates, Inc., the developer of Ridgewood Estates, recorded the declaration with the City of Cranston in 1987. The limitations, restrictions, covenants, and uses enumerated in the declaration were intended to be "covenants running with the land * * * for the benefit of and limitation on all future owners" of land in the subdivision.

■■■ The declaration explicitly allows any property owner in Ridgewood Estates "to institute and prosecute any proceedings at law or in equity against [any] person or persons * * * attempting to violate any such covenant or restrictions * * *." Moreover, this Court has recognized that owners may enforce restrictive covenants on land burdened by the same restrictions as their land, when the purpose of the covenants is to maintain a common scheme of development, as is the case with these covenants, and in particular, with covenant 8. *Emma v. Silvestri*, 101 R.I. 749, 751–52, 227 A.2d 480, 481 (1967). This Court's objective in interpreting restrictive covenants is to achieve the delicate balance in favor of "the free alienability of land while still respecting the purposes for which the restriction was established." *Gregory v. State Department of Mental Health, Retardation and Hospitals*, 495 A.2d 997, 1000 (R.I.1985). In so doing, we give the words of a restrictive covenant "their plain and ordinary meaning unless a contrary intent is discernable from the face of the instrument." *Id.* at 1001. Because the specific effects of applying restrictions can vary, depending on the land and covenants involved, "cases involving the interpretation of restrictive covenants must be decided on a case-by-case basis * * *." *Id.* at 1000–01.

The key restrictive covenant at issue here is covenant 8, entitled "Livestock and Poultry," which provides:

"No animals, livestock or poultry of any kind shall be raised, bred or kept on any lot, except that two (2) dogs and/or two (2) cats may be kept provided that they are not kept, bred or maintained for any commercial purpose. No kennels or other structure for the keeping of such pet shall be maintained on the premises."

The trial justice found that this covenant was ambiguous and concluded that

"the intent of the drafter of Restrictive Covenant 8 was to provide the residents and potential residents of the Ridgewood development from having a neighbor or neighbors engage in the business of keeping and raising animals in a farm-like setting for commercial purposes, i.e., the raising of chickens for their eggs and meat, the raising of cattle for dairy products, the maintaining of a horse stable for riding lessons and to make a profit by boarding other people's horses, etc.

"Additionally, the covenant is unclear as to whether such animals as are barred by Restrictive Covenant 8 are precluded from only the outside of a dwelling place or whether they are barred from the inside as well."

■■■ In construing restrictive covenants, we have held that "if there is ambiguity, it is to be resolved in favor of an unrestricted use." *Emma*, 101 R.I. at 751, 227 A.2d at 481. Covenant 8, however, is not ambiguous in stating that no structures for housing animals, kennels or otherwise, "shall be maintained" on any lot in Ridgewood Estates. This provision would constitute mere surplusage if its applicability were limited to animals kept for commercial purposes, as the trial justice found, given that the covenant's first clause restricts

even cats and dogs from being kept for commercial purposes. When presented with such a clear directive, "[w]e will not * * * seek ambiguity where none exists but rather we will effectuate the purposes for which the restriction was established." *Hanley v. Misischi*, 111 R.I. 233, 238, 302 A.2d 79, 82 (1973). The Mignaccas began building a shed, which they stated was necessary to shelter their horse. Given covenant 8's unambiguous proscription of structures for keeping animals, it was error to rely on ambiguity as a basis for not enforcing covenant 8.

■ We next address whether, as the trial justice found, covenant 8 was enforced arbitrarily and therefore should not be enforced in this case. Based on testimony and his viewing, the justice referred to numerous infractions of covenants in addition to those barred by covenant 8—for example, the presence of freestanding garages, sheds, and cabanas in Ridgewood Estates. He also noted that Rena Dressler (Dressler), the president of the association and one of the plaintiffs in the case, kept a snake and parrots in her home, in apparent contravention of covenant 8's allowing only cats and dogs. The trial justice further reported that the DelFarno family had kept a miniature horse similar to the Mignaccas' horse on their property, a fact that was known to at least one board member of the association, Laurie Biern (Biern).

This Court only rarely has addressed the issue of whether underenforcement of restrictive covenants renders them unenforceable. *Duffy v. Mollo*, 121 R.I. 480, 400 A.2d 263 (1979); *see post*. In such situations, "we often look to leading authorities and the law of other jurisdictions for guidance in making our determination." *Liberty Mutual Insurance Co. v. Harbor Insurance Co.*, 603 A.2d 300, 302 (R.I.1992).

■ The assertion that a covenant should not be enforced because of its previous arbitrary or under-enforcement is an affirmative defense, so when the Mignaccas raised it at trial, they bore the burden of proof. *Circle Square Co. v. Atlantis Development Co.*, 267 S.C. 618, 230 S.E.2d 704, 708 (1976). This burden may be met by showing that the covenant has been so arbitrarily or laxly enforced that its present enforcement is barred by waiver, estoppel, or laches. In this case, the Mignaccas argued that plaintiffs had waived the right to enforce covenant 8. To establish the defense of waiver, in our opinion, a defendant must prove that a plaintiff has waived the covenant through "substantial and general noncompliance." *Kalenka v. Taylor*, 896 P.2d 222, 226 (Alaska 1995) (quoting *B.B.P. Corp. v. Carroll*, 760 P.2d 519, 523–24 (Alaska 1988)). Alternatively, waiver can be demonstrated when changes to the area caused by unenforcement become "so radical and permanent as to render perpetuation of the restriction * * * plainly unjust because its original purpose can no longer be accomplished." *Duffy*, 121 R.I. at 486, 400 A.2d at 266.

The rationale for placing such a significant burden on a defendant claiming waiver is set forth in Restatement (Third) of Property: *Servitudes*, § 8.3, cmt. *f* at 502 (2000), which explains that doing so "is particularly important in common-interest communities and other real estate developments with associations, because the association should not be impelled to engage in overzealous covenant enforcement fearing possible waiver of future enforcement rights. Overzealous enforcement is costly to the community both financially and because it tends to be socially divisive." Moreover, while it may be appropriate for a court to refuse to enjoin the violation of a covenant on the ground of waiver if that covenant "has become obsolete," *id.*, the Rhode Island General Assembly has ad-

dressed obsolescence by creating a thirty-year limitation on the enforcement of restrictive covenants. G.L.1956 § 34–4–21. Hence, in this case, covenant 8, recorded in 1987, will not be enforceable after the year 2017, by operation of law.

▆▆▆ In addition, it is our opinion that the enforcement of one covenant or the failure to enforce that covenant has no bearing on the validity of a different covenant, in the event that both are contained in the same deed. *See Snow v. Van Dam,* 291 Mass. 477, 197 N.E. 224, 229 (1935) (holding that "the violation of some of the less important restrictions, but not of the restriction in question, by some of the plaintiffs [does not] deprive them * * * of the right to relief in equity"). Even if the residents of Ridgewood Estates have waived covenants regulating garages, tool sheds, and cabanas, as the trial justice suggested, such waiver could not be transferred or applied to covenant 8, which deals with an entirely different subject matter. Therefore, the enforcement of other covenants should not have been considered in ruling on the enforcement of covenant 8.

▆▆▆ Moreover, it was error to rely on evidence that many residents of Ridgewood Estates, including association president and plaintiff Dressler, kept house animals other than cats or dogs. The justice considered these examples as evidence of the arbitrary manner by which covenant 8 was being enforced. At trial, however, Dressler explained her interpretation of covenant 8 as barring outdoor animals such as horses but not indoor pets. In our opinion, this distinction was justified. For one, the title of covenant 8, "Livestock and Poultry," renders it reasonable to conclude that the restriction was not intended to ban indoor pets such as hamsters, birds, or fish. Second, the two animals explicitly permitted by covenant 8, namely, dogs and cats, are pets that can be kept outdoors. Third, covenant 8 prohibits "kennels or other structure[s]," which may be necessary to maintain certain animals outdoors. Thus, the Mignaccas' evidence that indoor pets other than cats and dogs were kept by numerous residents of the development, including the association president, was not probative of plaintiffs' selective enforcement or waiver of the covenant. Our holding in this respect is consistent with the position taken by courts in other jurisdictions that have overlooked "technical" covenant violations confined within a home while enforcing the same covenant to enjoin obvious violations occurring in the open. *Crimmins v. Simonds,* 636 P.2d 478 (Utah 1981); *Miller v. Bolyard,* 186 W.Va. 165, 411 S.E.2d 684 (1991) (per curiam).

In addition to the horse at issue here, only three violations involving structures for the housing of outdoor animals were presented at trial: Carl Weinberg (Weinberg), an association board member, kept a dog kennel on his lot; the Mignaccas housed their two Siberian huskies in a pen next to their horse; and the DelFarnos had kept a miniature horse in a utility shed that they converted into a barn. The Mignaccas, however, failed to establish that plaintiffs' actions or inactions in these instances amounted to a waiver of covenant 8.

▆▆▆ Specifically, no evidence was presented that these infractions were brought to the attention of the association or its board as a whole, or that the association considered and declined to enforce the covenant. The fact that Biern, a board member of the association, knew of the DelFarnos' miniature horse but failed to take action to enforce the covenant does not establish plaintiffs' waiver of covenant 8 as a result of selective enforcement. *See Miller,* 411 S.E.2d at 687 (citing *Wallace v. St. Clair,* 147 W.Va. 377, 127

S.E.2d 742, 756 (1962) (holding that a lot owner is not precluded from "insisting upon such observance because of his failure to complain of violations of the restriction by other property owners in a different portion of the restricted area, which were not consequential or, if consequential, did not materially and adversely affect him in the use and enjoyment of his own property")). Likewise, although Weinberg's maintenance of a dog kennel may be interpreted as a personal waiver of his enforcement rights against the Mignaccas, that alone did not preclude other plaintiffs from taking action to enforce covenant 8. *See Miller*, 411 S.E.2d at 687 (holding that "[t]he willingness of some lot owners in an area restricted to residential purposes to waive the benefit of the restriction does not preclude others from insisting upon its observance * * *"). Moreover, the Mignaccas have not established that they reasonably relied on any affirmative actions by the association indicating that it would be acceptable to keep a miniature horse on their property. Therefore, plaintiffs were not estopped from enforcing covenant 8 against the Mignaccas. *See Wallace*, 127 S.E.2d at 757.

Overall, the Mignaccas have failed to establish that the instances in which covenant 8 was violated amounted to "substantial and general noncompliance" with the regulations, *Kalenka*, 896 P.2d at 226, or that those breaches were indicative of changes to the subdivision "so radical and permanent as to render perpetuation of the restriction against [the proposed] use plainly unjust * * *." *Duffy*, 121 R.I. at 486, 400 A.2d at 266. The three violations cited in a subdivision of over seventy families did not change the character of Ridgewood Estates. *See Crimmins*, 636 P.2d at 480 (holding that "the existence of several breaches of a restrictive covenant does not justify refusal of enforcement unless the

character of the neighborhood has changed"). The Mignaccas thus did not meet their burden of establishing that plaintiffs' waived their ability to enforce covenant 8.

■ Our final consideration is whether, as the trial justice found, plaintiffs were not entitled to equitable relief even if the covenant were read to bar the horse from the Mignaccas' property because the justice determined that "[b]alancing the equities * * * none of the plaintiffs experience[d] any hardship by the Mignaccas keeping Sonny." Notwithstanding this finding, the trial justice correctly stated during trial that enforcing the covenants was of value to the parties and also to all residents of Ridgewood Estates. The trial justice noted the importance of enforcing Ridgewood Estates' restrictive covenants when he refused to allow a settlement of the case that would have permitted numerous violations of the covenants. He pointed out that:

> "the settlement that was proposed * * * was basically a sweetheart deal that would lead to the violation of the restrictive covenants on the part of both people on both sides. I, a Court sitting in equity, cannot approve, in my view, such a settlement.

> "So, I think it important that * * * to the extent that there is to be any settlement in this matter, that we do so in a way that will not prejudice the rights of any parties not before this Court, including the other people who have homes in Ridgewood and have something to say or might have something to say in the future about the validity of these restrictive covenants."

The trial justice also voiced concern that "anything that happens in this case * * * will not be precedent for other people on

other lots to start horse farms or any other form of farming * * *."

 The trial justice recognized that enforcing a restrictive covenant is important to all who are burdened and benefited by the restriction. For precisely that reason, plaintiffs seeking to enforce restrictive covenants need not establish money damages or any other hardship to receive equitable relief. *Crimmins*, 636 P.2d at 480. The trial justice therefore erred by denying enforcement of the covenant on the ground that plaintiffs did not experience any hardship by the Mignaccas keeping a horse. Establishing that the Mignaccas violated covenant 8 was sufficient for a court to provide the injunctive relief sought by the association.

Because we conclude that covenant 8 bars the Mignaccas from maintaining a horse in their yard in Ridgewood Estates, we need not address whether the horse's presence violated covenant 5 (Nuisances) or whether its shed violated covenant 6 (Temporary Structures).

## Adding Christian Mignacca as a Party

 In midtrial, after the parties stated that they would like to settle the case, the trial justice suggested that Christian Mignacca (Christian), the Mignaccas' minor son for whom his parents originally purchased the show horse, testify for a second time and be added as a party defendant to the deed restriction litigation. "Before there's any settlement," said the trial justice, "I want to hear from the child. As a matter of fact, the child should * * * be a party to this litigation * * *." The trial justice made this proposal in the belief that the court has a "paren[ ]s patriae or * * * some general supervisory authority over children who come [into court] and have an interest in the outcome of the litigation * * *."

This suggestion was not warranted. The parties agreed that Christian neither owned the real property, nor was he the owner of the horse. However, it does not appear that Christian was added as a party. Although he is named as a party in the case heading to the Mignaccas' memorandum of law filed on July 11, 2001, wherein defendants are named as "David Mignacca and Kathy Mignacca in their individual capacity and in their capacity as parent and next best friend of Christian Mignacca," the record contains no motions requesting that Christian be added or joined as a party, and none of the parties' memoranda filed with the court before or after July 11, 2001, contain any mention of Christian as a party or of the Mignaccas suing in their capacity as his parent and next best friend.

## Inapplicability of Cranston
## City Code § 4–2.1

 The Superior Court judgment affirmed the board's decision to allow "the Mignaccas to keep Sonny on their [p]roperty and house him in the shed they erected for that purpose * * *." In so doing, the trial justice found that the variance that the board granted was unnecessary because the Mignaccas were entitled to keep the horse on their property pursuant to chapter 4, section 2.1 of the Cranston City Code (city code § 4–2.1). Although none of the parties had raised this argument at trial, the trial justice seized upon this ordinance and remanded the case back to the zoning board with directions to declare that "Ordinance 4–2.1 precludes the necessity of granting a dimensional or any other variance to the Mignaccas * * *." We deem this to be error.

Chapter 4, entitled "Animals," and § 4–2.1 therein, entitled "Keeping animals in certain districts prohibited" and enacted as ordinance [19]74–77, provides that "No person shall keep any horse within any

closely built-up residential area unless he shall have available * * * at least twenty thousand square feet of pasture area." The trial justice reasoned, "As an acre contains 43,560 square feet, and the Mignaccas have a four acre house lot, there does not appear to be any question but that they can keep a miniature horse on their property." This finding, however, conflicts with Cranston's zoning code, Chapter 30 of the Code of the City of Cranston, effective as of December 31, 1994, pursuant to the Rhode Island Zoning Enabling Act of 1991 (P.L. 1991, ch. 307, § 1) (enabling act), G.L.1956 § 45–24–27 through § 45–24–72. The "Schedule of uses" delineated in § 30–8 of Cranston's zoning code provides that the "[r]aising and keeping of animals on *not less than 10 acres*" is a "permitted use" in the A–80 zone in which the Mignaccas reside. (Emphasis added.) Clearly, the zoning code's Schedule of uses conflicts with city code § 4–2.1.

■ Generally, when two ordinances irreconcilably conflict one with the other, we shall give effect to the more recent enactment, *Whyte v. Sullivan,* 119 R.I. 649, 654, 382 A.2d 186, 188–89 (1978). Further, we held in *Munroe v. Town of East Greenwich,* 733 A.2d 703, 708 (R.I. 1999), that an act of general applicability, in that case the Development Review Act, superseded an inconsistent home rule charter provision. Consequently, we can conclude that the Cranston zoning code, enacted pursuant to the zoning enabling act, trumps inconsistent provisions in the city code. As such, zoning code § 30–8, the more recent ordinance enacted pursuant to a state law of general applicability, trumps city code § 4–2.1. In the absence of findings of fact on whether § 30–8 prohibits the keeping of miniature horses on less than ten acres, the trial justice had no basis on which to declare that a variance was unnecessary in this instance.

■ Moreover, our well-established precedent controls in this case, namely, that "[a] zoning ordinance cannot destroy the force and effect of a restrictive covenant." *Farrell v. Meadowbrook Corp.,* 111 R.I. 747, 750, 306 A.2d 806, 808 (1973) (citing *Hill v. Ogrodnik,* 83 R.I. 138, 143, 113 A.2d 734, 738 (1955)). Therefore, even if § 30–8 of the zoning code did permit a horse on the property, restrictive covenant 8 of the Mignaccas' deed trumps the zoning provision. Consequently, the horse is not permitted and the judgment of the Superior Court is vacated.

### General Laws 1956 § 45–24–69

■ With respect to plaintiffs' appeal of the board's decision to grant the Mignaccas a variance, the Superior Court justice exceeded his limited authority when reviewing a zoning board of review decision pursuant to § 45–24–69. Although § 45–24–69(c) does "allow any party to [a zoning board of review] appeal to present * * * evidence in open court" if the Superior Court trial justice finds "that additional evidence is necessary for the proper disposition of the matter," the trial justice in this case exceeded his authority by conducting a view and *sua sponte* telephoning the Clerk of the City of Cranston to request a copy of city code § 4–2.1. In addition, when an appeal of a zoning board of review's decision is consolidated with a restrictive covenant case, the facts relevant only to the restrictive covenant issue cannot be subsumed or commingled in deciding the zoning appeal. If the consolidated case is thereby rendered difficult or impossible to decide, then the cases should be bifurcated.

Moreover, § 45–24–69(d) provides that, in hearing an appeal from a zoning board of review decision, the Superior Court "shall not substitute its judgment for that of the zoning board of review as to the

weight of the evidence on questions of fact. The court may affirm the decision of the zoning board of review or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced * * *." We have held that, when a zoning board of review or other municipal board acting in a quasi-judicial capacity does not provide a record sufficient to allow for judicial review, the case should be remanded to the board with directions to make findings of fact and conclusions of law based on the required evidence. *Cranston Print Works Co. v. City of Cranston*, 684 A.2d 689, 691–92 (R.I.1996).

In this case, the board did not provide a record suitable for judicial review when it granted the variance to maintain the horse on the Mignaccas' land. No findings of fact or conclusions of law were compiled on the record to support the board's decision to grant this variance. *Eastern Scrap Services, Inc. v. Harty*, 115 R.I. 260, 263, 341 A.2d 718, 719–20 (1975). The record contains no evidence whatsoever that "the hardship from which the applicant seeks relief is due to the unique characteristics of the subject land" or that "the hardship that will be suffered by the owner of the subject property if the dimensional variance is not granted shall amount to more than a mere inconvenience, which shall mean that there is no other reasonable alternative to enjoy a legally permitted beneficial use of one's property," as required by the Cranston City Code § 30–28(b)(1) and (c)(2) and by § 45–24–41(c)(1) and (d)(2). Moreover, even assuming that city code § 4–2.1 were applicable to this case, the record contained no findings of fact relevant to that ordinance, such as whether the Mignaccas' land contained any pasture at all. In these circumstances, the case should have been remanded to the board with directions to provide a record delineating findings of fact and conclusions

of law that would be sufficient to support judicial review.

### Preservation of "Accessory Use" Issue

Last, we decline to consider the Mignaccas' argument, raised for the first time during the appeal before the Superior Court, that a variance was not required to maintain a horse because keeping the horse was merely an "accessory use" of their property for which no variance is needed. "The established rule of law in Rhode Island is that we shall not consider an issue raised for the first time on appeal that was not properly presented before the trial court for its consideration." *International Depository, Inc. v. State*, 603 A.2d 1119, 1122 (R.I.1992). Although the Mignaccas raised the argument that a variance was unnecessary before the Superior Court, the zoning board of review was the appropriate venue in which this issue should have been presented. After applying for a variance to the board and after arguing in favor of a variance at a hearing before the board following the planning commission's determination that a variance was required to maintain a horse on their land, the Mignaccas cannot, for the first time on an appeal before the Superior Court, disclaim the need for a dimensional variance.

### Conclusion

In summary, therefore, the association's appeal is sustained, and the judgment of the Superior Court denying injunctive relief is reversed. We return the papers in this case to the Superior Court, with directions to enter judgment permanently enjoining the Mignaccas from keeping a miniature horse on their property in Ridgewood Estates.

Additionally, with respect to the judgment of the Superior Court affirming the decision of the zoning board of review, the

petition for certiorari is granted, the Superior Court judgment is quashed, and the case is remanded to that court with instructions to enter judgment denying the relief granted by the zoning board of review.

Justice LEDERBERG participated in all proceedings related to this case and authored this opinion for the Court prior to her death on December 29, 2002.