DECISION
Having received evidence during a 2 1/2 day, jury waived trial, and after considering the memoranda and arguments of counsel for the parties, this case is now ripe for decision. At issue is whether or not this Court will grant plaintiffs' request for injunctive relief, requiring the defendants to remove a large motor home from their residential property.
The Parties.
Plaintiffs are the Board of Directors and officers of West Reach Estates Home Owners Association ("Association"), a successor home owner association originally created by a declaration filed in the land records of the Town of Jamestown on January 29, 1979. The declaration of rights and responsibilities, entitled West Reach Estates Conditions and Restrictions ("Restrictions"), includes various restrictions and procedures regarding the development and use of the 56 house lots in the subdivision. There is no disagreement that the Restrictions run with the land and are made specifically enforceable by the Association. *Page 2 
Defendants Hugh and Joan Collard ("the Collards") are husband and wife who currently reside at 390 West Reach Drive, a recently constructed, waterfront home within West Reach Estates. They own and keep at their residence a large motor home which the plaintiff Association claims is stored in violation of the restrictions.
The Association seeks the immediate removal of the motor home together with attorneys' fees and costs incurred as a result of this litigation.
Facts.
In 1978, the Commerce Oil Refining Company developed a residential community known as West Reach Estates. Located near the north end of Jamestown, the 56 lot plat was planned to favor the building of similar, expensive homes and to impose restrictions on lot development to "insure the orderly development . . . [of] an attractive residential area."[1]
Each lot owner is obligated to observe a number of covenants and restrictions which are set forth in the Restrictions, a body of covenants and restrictions which have been filed in the land records of the Town of Jamestown. Enforcing compliance with the Restrictions is the responsibility of a Board of Directors. The board is required to approve house plans prior to construction as well as resolve complaints concerning alleged violations of the various restrictions. According to Dr. Hancur, who is president of the Association and thus a board member,[2] there have been some 20 complaints regarding restriction compliance from various Association members which the board has either resolved or is currently in the process of resolving. One of these is the subject of the instant lawsuit. *Page 3 
In 2001, the Collards received a lot in West Reach Estates as a gift from Mrs. Collard's father. Familiar with the property and its water view, they soon commenced planning to construct a custom home on the land which has been assigned the address of 390 West Reach Drive. With the assistance of an architect and an engineer, site plans, elevations, and a floor plan were developed by the summer of 2002. The plans were submitted to state regulatory authorities. After receiving the necessary state approvals, the Collards filed their plans with the Town of Jamestown Building Inspector. Next, they approached the Association because the Collards knew that in addition to the statutorily required approvals, they needed to receive an approval of their intended building project from the Association.
Mrs. Collard testified that she learned during a telephone call with the secretary of the Association that the board needed to review the Collards' building plans and to further that process, she could speak with Association president, Dr. Hancur. Mrs. Collard placed a telephone call to Dr. Hancur during which a meeting at his home was arranged for November 15, 2003. The recollections of the participants concerning this key meeting are very different. Both Dr. and Mrs. Hancur recall that the meeting was only about 10 minutes in duration. However, Mrs. Collard who has a much clearer and more credible recollection of the meeting, recalls it lasting about 45 minutes. She recalls having brought a copy of her building plans and having asked Dr. Hancur to review them while she and her husband waited. She explained that she did not want to leave a copy of the plans for Dr. Hancur to later review with the board because she and her husband had only one remaining set of the plans, the others being in the possession of contractors. *Page 4 
Both Dr. and Mrs. Hancur recall that the meeting was awkward and tense. Contrary to the testimony of her husband, Mrs. Hancur is certain that no site plan was presented. She explained that had the Collards' site plan been shown to her and her husband, the presence of a motor home "pad" would have caused her to "freak."[3] Claiming to have an excellent memory of the meeting and to have been a participant for its entire duration, Mrs. Hancur is positive that there was no discussion of a motor home owned by the Collards or their intention to bring a motor home into West Reach Estates.[4] This Court did not find Mrs. Hancur's testimony credible.
Dr. Hancur, then and still the president of the Association and thus a member of the board, is far less certain as to what was discussed at the meeting. He does recall that it was awkward because Mrs. Collard refused to sit down or leave the building plans. Although he does not "recall" any discussion about a motor home, he does recall reviewing not only a floor plan and elevations, but also a site plan for the Collards' intended home construction project. A parking or storage place for a "motor home" is clearly delineated on the site plan prepared in August 2002, and subsequently filed with both the state and Town of Jamestown regulators. See Exhibit A.
Because she refused to leave a copy of the building plans with Dr. Hancur, he agreed to verbally report to the board about the Collard's intended construction.[5] In fact, at the next board meeting, Dr. Hancur reported his review of the Collards' plans. He also *Page 5 
telephoned the Jamestown building inspector from whom he received assurances that the plans met all zoning requirements.
The Collards' recollection of the November 15, 2003, meeting at the Hancur home is remarkably different. They recall the meeting being very friendly and relaxed, lasting about 45 minutes. Mrs. Collard recalled sitting down on a sofa with Dr. Hancur and going though site plans, the floor plan, and elevations which were placed on a coffee table. She was clear in her stated recollection that, because she had only one set of plans remaining, she asked that Dr. Hancur review them in her presence and only if necessary, require her to make another copy for the board. She recalls that Dr. Hancur looked at all of the plans and agreed to make a verbal report to the board. Mrs. Collard insists that she made it very clear to Dr. Hancur that they intended to bring a mobile home on to their lot because it was a very important part of their life style.[6]
She recalls pointing out the "RV site"[7] and invited Dr. Hancur to bring the issue of its storage on the lot to the attention of the board.
Mrs. Collard also testified convincingly about telling Dr. Hancur how she and her husband planned to landscape the property so as to screen the mobile home inside a "park like setting."[8] She offered that she wished her lot to be attractive and concealing but not have so many tall trees as to block the view of neighbors. So important was the motor *Page 6 
home to the Collards that Mrs. Collard testified that, "if we could not get approval for the motor home, we would not have built the house."
Regardless of whose rendition of the meeting is accepted, it is agreed that after discussing the Collards' building project with the board, Dr. Hancur telephoned Mrs. Collard to advise her that the plans were acceptable to the board.[9] Dr. Hancur testified that through this telephone call, he intended to convey an approval to the Collards to go ahead with construction.
Not receiving any written confirmation of the informal approval of their plans related by Dr. Hancur during his telephone call to her, Mrs. Collard telephoned the secretary of the Association to inquire as to what type of notice she would receive concerning the approval of the construction plans. The secretary, Linda Supron, advised Mrs. Collard that "we are not that formal," we won't send you anything in writing. This Court finds that based upon the information submitted to Dr. Hancur on November 15, 2003, and his subsequent meeting with the board, the Collards received approval of their plans in accordance with the restrictions. Although the restrictions require written approval by the Association,[10] the pertinent restriction is apparently never followed or enforced. The Collards appear to have done everything that they could have done under the circumstances to obtain written approval from the Association. The approval, referred to as "informal approval" at trial, was sufficient. The Collards were justified in proceeding with their construction plans as disclosed.
After receiving their approval, the Collards hired a landscape architect to design plans to beautify their home site as well as conceal the motor home which they intended *Page 7 
to store on a pad adjacent to their garage. The plans for the elaborate landscaping design were introduced at trial.[11] The Collards claim that the plans have not been carried out due to this litigation. The Court finds, however, that the Collards failed to make a good faith effort to carry out their landscape plan during the several months immediately prior to the arrival of the motor home at West Reach Estates. The filing of this lawsuit did not occur until late June 2006.
On February 6, 2004, about 2 months after the "approval" call from Dr. Hancur, the Collards applied for a building permit with the Town of Jamestown. Clearing of the Collard's lot began in the spring of 2005. The foundation was poured shortly thereafter and construction of the home proceeded.
A letter from Dr. Hancur, writing as the president of the Association, was received by the Collards shortly after August 2, 2005. By his letter, Dr. Hancur reminded the Collards of Restriction number 6 of the Restrictions. He noted the on-going construction of a pad for a mobile home and wrote that such a pad was "in direct violation of the aforementioned Condition and Restriction number 6." Dr. Hancur then directed that the Collards revise their house plans so that their mobile home could not be seen from the road. The Collards responded with a letter dated August 31, 2007,[12] indicating that they were "shocked" by the content of Dr. Hancur's communication. The Collards' letter served to remind Dr. Hancur that he had given the Collards approval of their building plans on behalf of the Association. Moreover, the letter conveyed a detailed summary of their discussion held at the Hancurs' home on November 15, 2003, including *Page 8 
a discussion of the motor home and its location on the site plan which was reviewed by Dr. Hancur.
The Collards' letter was answered by another letter authored by Dr. Hancur on behalf of the Association dated October 7, 2005.[13] The letter somewhat disingenuously suggests that the Collards had improperly relied on a waiver of the Association's restrictions by Dr. Hancur. Even more suspect is Dr. Hancur's suggestion that even though the Collards have a right to pave an area beside their garage, they did not have a right to park or store a motor home in that location. Hancur's letter further states, "it is fortunate" for the Collards that the board had brought this problem to their attention "before completion of your house so that you do not incur unnecessary expense should you decide to park your recreational vehicle elsewhere on your property." Of course, by this time the home was framed and there was no possibility to locate the motor home at a different site on the Collards' lot.
The Collards continued to construct their home. They also began to landscape a small portion of their lot near the motor home pad, in anticipation of the possibility that they could move into their new home during the winter months. That did not happen.
The board logically concluded that the Collards' landscaping suggested an imminent arrival of the motor home. The board continued to discuss what to do if the Collards brought their motor home to West Reach Estates. Dr. Hancur testified that the board had received some 20 complaints over the years concerning alleged violations of the Restrictions. However, the facts at trial indicated that for many years, a number of residents parked or stored commercial vehicles, trailers, and boats — large and small — on *Page 9 
their lots. Clearly, as several photographs and Mrs. Collard's testimony proved, some of these were not stored in an "inconspicuous place" as required by Restriction 6.[14]
A concerted effort to enforce Restriction 6 commenced as late as January 2006. Several letters were addressed to home owners who were deemed to be in violation because of the manner in which they stored or parked vehicles and boats. To assist the board in its enforcement responsibilities, the board adopted — for the first time in its 28 year history — a definition of "inconspicuous location."[15] The definition was circulated by letter to all Association members.[16] The letter which was authored by Dr. Hancur indicated that "some lots may not have an "inconspicuous location" due to the peculiarities of the lot itself or placement of the house. In those instances, "parking or storage of such conveyances is prohibited." Moreover, although Dr. Hancur testified that the definition of "inconspicuous location" passed by the board in early 2006 was not directed at the Collards, the anti-fence and landscaping prohibition language contained in the definition would seem to impeach his assertion. The only evidence introduced at trial concerning a landscaping screen or fence anywhere in West Reach Estates, was the configuration of trees planted by the Collards in the fall of 2005. See Exhibit 12.
The Collards' home was completed in May 2006, and a certificate of occupancy was issued on May 31, 2006. In June 2006, the Collards moved in and their motor home was parked on the "pad" shortly thereafter. It has not moved since. This lawsuit was filed within days of its arrival. Since the commencement of the lawsuit, Dr. Hancur and the Association Board have worked feverishly to compel the removal or relocation of boats *Page 10 
and trailers that have been historically stored in obvious locations by some of the Association members. Just a few weeks before trial, letters[17] were addressed to certain restriction offenders, demanding that they bring their lots into compliance with Restriction 6. These efforts have proved successful with the exception of the Collards and one other resident. Additional facts will be supplied as necessary.
Issues presented.
Plaintiffs seek the immediate removal of the Collards' motor home together with attorneys' fees and costs. Defendant Collards seek to have the lawsuit dismissed, claiming that they fully intend to locate the motor home in an inconspicuous place which will be created by the elaborate landscaping that they had intended to place on their property from the beginning. Defendants assert that they fully disclosed to the board through their lengthy pre-construction meeting with Dr. Hancur, their plans to locate a motor home beside their garage, and to screen the vehicle with an expensive landscaping plan. Moreover, they assert that the board's recently promulgated definition of "inconspicuous location" cannot be applied to them. This is because the definition was promulgated well after the time that the Collards received all approvals including a certificate of occupancy. Moreover, they argue the definition is clearly meant to impermissibly single them out, resulting in impermissible, selective enforcement of the deed restrictions.
Discussion.
Restriction 6 provides:
No commercial vehicles shall be parked or garaged on a lot. Boats,trailers, sport campers and similar conveyances shall be stored in aninconspicuous place on a lot but not closer to a street than thebuilding set back line. *Page 11 
Although there is substantial discord with respect to the meaning of Restriction 6, the parties are in agreement that the Restriction 6 is valid as written and recorded and it applies to all lots in West Reach Estates. The Collards assert that by reason of less than vigorous enforcement of Restriction 6 over the years, this Court should declare that the Association has waived its enforcement as to the Collards. This Court declines their invitation and holds that the Collards must conform the use of their lot to the Restriction.[18] Similar covenants which run with the land have been consistently held to be enforceable.See Ridgewood homeowners Association v. Zoning Board of Review ofCranston, 813 A.2d 965, 971 (R.I. 2003). Having stated the obvious, this Court must determine how the Restriction governs the Collards' use of their lot.
 The "objective in interpreting restrictive covenants is to achieve the delicate balance in favor of the `free alienability of land while still respecting the purposes for which the restriction was established.' In so doing, [our high Court] gives the words of a restrictive covenant `their plain and ordinary meaning unless a contrary intent is discernable from the face of the instrument.' Because the specific effects of applying restrictions can vary, depending on the land and covenants involved, `cases involving the interpretation of restrictive covenants must be decided on a case-by-case basis. . . .'" Ridgewood at 971.
There is no dispute that the Collards' motor home is a vehicle subject to the restriction. Moreover, the Collards acknowledge that they were aware of Restriction 6 and, from the outset of their building project, intended to comply with it. This Court has found that the credible evidence shows that approval was given by the West Reach *Page 12 
Estates Board for the Collards' building plans which included a storage location for a motor home. However, there is no evidence that the Collards disclosed the size of their motor home. Nor have the Collards even attempted to create landscaping that would arguably screen their extremely large motor home. They placed a few trees on one side of the motor home pad and then simply drove the motor home to their lot in June 2006 where it has remained. Even the Collards would not argue that without the completion of their landscaping project, the motor home is in an "inconspicuous place."
Common sense must recognize that although the Collards and other residents of West Reach Estates have a right to store boats and motor homes on their property, subject to the limitation that they be stored in an inconspicuous place that right is not unlimited. For example, it is unlikely that an association member would be allowed to store a J Class Boat in West Reach Estates. Although recognized as the most beautiful yacht design in the world, because of a draft of 15 feet and a length of approximately 120 feet, even while dismasted, no inconspicuous place would be available, given the apparent terrain and limited size of the West Reach Estate lots.[19] Thus, although approval for the Collards' motor home pad was given,[20] the limits of the approval are governed in part by a commonsensical reading of the Restriction, the Collards' interest in having their motor home on their lot, and the overall purpose of the body of covenants and restrictions which run with every lot in West Reach Estates. This Court does not conclude that it would be impossible for the Collards to landscape their lot in such a way as to provide an *Page 13 
inconspicuous place for their motor home. However, the elephantine[21]
size of the vehicle does present a landscaping challenge.
Plaintiffs argue that landscaping in the manner planned by the Collards will not satisfy the Restriction 6 prohibition. They point to the definition of "inconspicuous location" which was adopted by the board in early 2006 after the Association discussed the meaning of the term at its annual meeting. See Exhibit D. It is clear to this Court that the definition adopted and promulgated by the board was for the purpose of preventing the Collards from bringing their motor home into the community. This recently manufactured definition is not part of the recorded Restrictions. It is nothing more than one element of a concerted plan to selectively enforce Restriction 6 against the Collards. Accordingly, it is without legal force.
The term "inconspicuous" is not without a well understood definition. As stated in the board's letter authorized by Dr. Hancur on March 10, 2006, the "Webster definition of `inconspicuous' [is] `not readily seen'". Exhibit E.[22] Not readily seen or noticeable does not mean that the conveyance at issue must be hidden or obscured. It simply means that the conveyance can not be readily noticeable from a given vantage point. It appears clear to this Court that the drafters of the Restrictions intended that the vantage point from which the boat or vehicle must be not readily noticeable is from the street on which the lot is located.[23] Thus, should the Collards put into place a landscaping plan that would screen their motor home so as to make it not readily noticeable from the street, this Court *Page 14 
concludes that their motor home can be properly stored on the pad which was designed, approved, and built for its storage.
Conclusion.
Plaintiffs have proved by clear and convincing evidence that Defendants Hugh and Joan Collard have knowingly violated Restriction 6 of the West Reach Estates Conditions and Restriction. There can be no doubt that, at present, the Collards' motor home located on lot 390 is not in an "inconspicuous place" as that term is used in Restriction 6.
Defendants Hugh and Joan Collard shall remove their motor home from lot 390 within 48 hours of the filing of this Decision. Consistent with Condition/Restriction 14 of the West Reach Conditions and Restrictions, Plaintiffs are entitled to recover costs and attorneys fees, the amount of which shall be determined by the Court after submission of relevant evidence. Defendants shall not be prohibited from locating their motor home on lot 390 after landscaping is in place that will make the motor home and the location of its storage an "inconspicuous place." Counsel shall submit the appropriate order for entry.
[1] West Reach Estates Conditions and Restrictions, at 1. (Exhibit 3.)
[2] The Association board is made up of 4 Association officers and an ad hoc member of the Association. The Association membership is comprised of every lot owner.
[3] See n. 6, infra.
[4] Whereas Mrs. Collard testified in detail about a number of subjects which she discussed with the Hancurs, Mrs. Hancur denies that such conversations ever took place. For example, Mrs. Collard recalls a discussion concerning the size of the Collard's proposed pantry and the fact that the Hancurs had a dumb waiter installed in their home (they do). Mrs. Hancur testified that these conversations simply did not occur.
[5] This Court finds the testimony of Dr. Hancur somewhat troubling. He testified that he was "shocked" that Mrs. Collard refused to allow him to retain a copy of her building plans, yet he agreed to verbally describe the Collards' building project to the board and report back to the Collards. This seems more than slightly incongruous.
[6] Mr. Collard likewise recalls telling Dr. Hancur that he would be storing his mobile home on the property for lengthy periods of time and that Hancur indicated that it would not be a problem. Mr. Collard's recollection of the meeting, like that of his wife, is substantially more expansive than those of Dr. Hancur or his wife. Mr. Collard recalls discussing some brush that Dr. Hancur had left on the Collard's lot as well as the Collards' plans with respect to the removal of white birch trees incident to the construction of the Collards' new house.
[7] The term "motor home" is used on the site plan.
[8] Of the $30,000 budgeted for landscaping, the Collards have only spent $10,000, electing not to complete the landscaping if this Court orders that the mobile home be removed.
[9] Mrs. Collard testified that in the call, Dr. Hancur said, "Congratulations, your plans have been approved."
[10] Exhibit 2 at 2.
[11] Exhibit F.
[12] Exhibit 5.
[13] Exhibit 6.
[14] See, e.g., Exhibits G, H, I, L, Q, T, W, and AA.
[15] See minutes of February board meeting. Exhibit D. While it appears to be of no significance, the actual language of Restriction 6 speaks of an "inconspicuous place" not "inconspicuous location".
[16] Exhibit E.
[17] Exhibits 14, 17, 22, and 23.
[18] The Association has conducted a community-wide enforcement effort of Restriction 6 in recent times. Defendants' reliance on any waiver defense is precluded from their own testimony that they knew of the subject restriction even before they commenced construction and wanted to abide by its terms.
[19] Built in the 1930's, ten J boats were designed to race in the America's Cup. One of them, Shamrock V, is still seen in the waters off Jamestown during the summer months.www.jclassyachts.com/history.html
[20] Because this Court finds that the Association gave its approval to the Collards to build a pad for their motor home, the Court does not reach defendants' argument that the Association should be prevented from enforcing Restriction 6 by reason of the doctrine of equitable estoppel.See El Marocco Club, Inc. v. Town of Johnston, 746 A.2d 1228, 1233-34
(R.I. 2000).
[21] The motor home exceeds the height of a one story building and is much longer than the depth of the Collards' garage. See Exhibit 8. Viewed head-on, the profile of the vehicle is larger than a garage bay door. Exhibit 9.
[22] The sole definition for the word "inconspicuous" as found in Merriam Webster's Collegiate Dictionary (10th Ed. 1994), is "not readily noticeable".
[23] This is also the board's interpretation of the restriction.