Thomas D. CULLEN

v.

Robert TARINI et al.

No. 2009–224–Appeal.

Supreme Court of Rhode Island.

March 7, 2011.

R. Daniel Prentiss, Esq., for Plaintiff.

Daniel V. McKinnon, Esq., Pawtucket, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Chief Justice SUTTELL, for the Court.

A landowner's efforts to protect his "spectacular" ocean views underlie this appeal. More specifically, we are asked to address the enforceability of restrictive covenants against a neighboring landowner, notwithstanding the neighbor's expenditure of over $1 million to construct a house that violates the restrictions in several key respects.

The defendants, Robert and Nellie Tarini and Hammersmith Investment Associates, LLC, appeal from a Superior Court judgment granting a permanent injunction

to enforce the restrictive covenants. On appeal, defendants contend that the trial justice erred in two primary respects: (1) in granting injunctive relief to plaintiff without balancing the equities between the parties and without proof of irreparable harm to plaintiff; and (2) in overlooking and misconceiving material evidence. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

## Facts and Procedural History

Since 1976, Thomas D. Cullen (plaintiff) has owned and resided at a parcel of real property located on Beacon Hill Road in the City of Newport. At trial, plaintiff testified that this property "is very nearly the highest point on Aquidneck Island," with "a grand vista that looks out to the south and to the southeast that has direct ocean views that are spectacular." Prior to 2002, plaintiff also owned an unimproved parcel of real property adjacent to and south of plaintiff's lot, located on Hammersmith Road (Hammersmith lot).

In 2002, in contemplation of a possible sale of the Hammersmith lot, Mr. Cullen executed a "Declaration of Easements, Restrictions, Conditions, Limitations Servitudes and Uses For Parcel 3 Telegraph Hill Subdivision" (declaration), placing certain restrictive covenants on the Hammersmith lot in favor and for the benefit of plaintiff's lot. The plaintiff testified that the Hammersmith lot "is in direct line of the main vantage point" of the home on plaintiff's lot, and that the restrictions on the Hammersmith lot were "very important to [plaintiff] in order to make sure

that it would be kept as [plaintiff] would like to see it."

The declaration divides the Hammersmith lot into three separate areas: the Homesite Building Area, the View Easement Area, and the Open Space Maintenance Area. The declaration prohibits any construction within either the Open Space Maintenance Area or the View Easement Area, and requires that all construction on the Hammersmith lot be restricted exclusively to the Homesite Building Area. Further, the declaration limits the building footprint to 3,500 square feet, with an additional 1,000 square feet allowable for accessory structures such as a garage.[1] The total interior area, excluding basement space, is limited to 7,000 square feet, and the maximum height is set at thirty feet above a defined reference grade.

In or around 2003, the undeveloped Hammersmith lot was sold to a third party (the Olingers). According to Mr. Cullen's testimony—found to be credible by the trial justice—the Olingers approached plaintiff, seeking relief from the restrictive covenants. The plaintiff testified that he informed the Olingers that "the restrictions that were contained in the declaration would be enforced."

In 2005, the Olingers sold the Hammersmith lot to defendants, Robert and Nellie Tarini, subject to the declaration.[2] Before buying the Hammersmith lot, defendants were notified of the restrictive covenants, and they included within the purchase and sale agreement a condition permitting them to obtain clarification, from the declaration's author, attorney Richard Sayer, about certain restrictions.[3] Mr. Sayer re-

---

1. The declaration states that the building footprint includes "porches and decks but not terraces."

2. In 2007, defendants deeded the Hammersmith lot to Hammersmith Investment Associ-

ates, LLC, which is also named as a defendant in plaintiff's complaint.

3. In particular, defendants sought clarification about: (1) measurement of the defined reference grade; (2) whether a combined resi-

sponded to defendants by letter, addressing each of their questions.[4] Although Mr. Tarini asserted at trial that Mr. Sayer's letter did not answer all his questions, he had no recollection of whether he ever asked for further clarification. After receiving the letter, defendants closed on the purchase of the Hammersmith lot.

Thereafter, Mr. Tarini hired Paul St. Amand to design and build a home on the Hammersmith lot. Mr. Tarini gave conflicting testimony concerning whether he had given Mr. St. Amand copies of the declaration. Mr. St. Amand's testimony—accepted as credible by the trial justice—indicated that Mr. Tarini did not give Mr. St. Amand a copy of the declaration, did not inform him of the declaration's existence, and did not tell him about any square footage and height limitations on the building that Mr. St. Amand was to design and construct. Instead, Mr. St. Amand testified, the only restrictions of which he was aware were those delineated in a site plan given to him by Mr. Tarini, depicting the boundary lines of the Homesite Building Area. Mr. St. Amand further testified that Mr. Tarini told him that the boundary lines were to be used as general guidelines only.

Throughout the design development process, Mr. St. Amand prepared drawing plans of the house design, and provided Mr. Tarini with copies of the plans. Drawing plans produced as early as February 2007 revealed a ground floor of 4,256 square feet, plus a garage of an additional 1,101 square feet, combining for a total structured footprint of approximately 5,357 square feet, not including porches, decks, or terraces.

The parties do not dispute that later, at some time between August and October 2007, a meeting took place at plaintiff's home that plaintiff, Mr. Tarini, and others attended. The parties do dispute just when this meeting occurred, who was present, and what took place. Mr. Tarini testified that this meeting took place in August and that the only other witness present was Mr. Tarini's business associate, Edmund Craig, although Mr. Tarini testified that it was possible that other neighbors were present as well. Mr. Craig also testified that the meeting took place in August. The plaintiff, on the other hand, recalled that the meeting took place in October and that neighbors Christopher Pell and Lisa and Earl Stubbs and an acquaintance of Mr. Tarini attended it.

Mr. Cullen testified that at this meeting, he informed Mr. Tarini that he previously had denied the request of the Hammersmith lot's prior owners, the Olingers, for permission to construct a home that was larger than permitted in the declaration. The plaintiff's testimony was corroborated at trial by the testimony of Mr. Pell. Mr. Tarini testified that he did not recall this discussion taking place.

It is undisputed that at this meeting, Mr. Tarini presented plaintiff with two preliminary drawing plans showing the general design and shape of the structure he planned to build on the Hammersmith lot. At trial, Mr. Tarini acknowledged that he was aware, at the time of this meeting, that his plans exceeded the declaration's limitations,[5] but that he offered

dence and integral garage could extend to a footprint area of 4,500 square feet; and (3) whether existing grades on the site could be altered to accommodate driveways, structures, and in-ground pools.

**4.** Most pertinently, Mr. Sayer clarified that if a single structure was built with an integral garage, the total allowable footprint would be 4,500 square feet.

**5.** Mr. Tarini testified that the drawing plans showed the footprint of the house in excess of

plaintiff no information about the size of the house. Mr. Tarini testified that the reason he did not inform plaintiff of that fact was because he did not want to begin the building process without plaintiff first studying the drawing plans, which Mr. Tarini thought were sufficiently scaled for plaintiff to analyze compliance with the restrictive covenants. In presenting these plans to plaintiff, Mr. Tarini further testified, his intention was to allow plaintiff to "compare the plans to the restrictions and voice any concerns that he may have had," and that Mr. Tarini would "subtly attempt to get [plaintiff's] feedback."

Mr. Cullen, on the other hand, contended that the drawing plans contained no meaningful information from which the size or location of the building could be determined. Although one of the drawing plans did contain a measurement scale, plaintiff maintained that the plans were insufficient because they contained no other building dimensions or measurements. Based on his meeting with Mr. Tarini, plaintiff testified that he had no reason to suspect that the plans would fail to comply with the declaration and that he did not review the plans until approximately December 1, 2008.

After the meeting at Mr. Cullen's home, the next meeting between the parties occurred during a chance encounter at a restaurant in Newport. At this meeting, Mr. Tarini did not offer any information about the dimensions of the house. Mr. Tarini did, however, express to plaintiff that he was in the process of going before the Newport Historic District Commission (HDC) as part of the permitting process for development on the Hammersmith lot. Mr. Tarini testified that he invited plaintiff to attend some of the meetings before the HDC so that plaintiff "could be kept aware of the changes [to the drawing plans] that

would be made over time." The plaintiff testified that he decided not to follow the HDC proceedings, however, because he had no reason to suspect that the drawing plans would not be in conformity with the declaration.

Thereafter, Mr. Tarini testified, another meeting occurred around December 2007 at the home of Mr. Pell, and that plaintiff, Mr. Tarini, Mr. Pell, and Mrs. Stubbs attended it. Mr. Tarini testified that at this meeting, he presented plaintiff with a scaled, three-dimensional model that portrayed the Hammersmith lot and the designed home situated on it. At trial, Mr. Cullen did not recall this meeting taking place, nor did he recall receiving any plans from Mr. Tarini other than the two drawing plans that Mr. Tarini gave to him earlier that year. Mr. Pell testified that he remembered Mr. Tarini bringing a model to a meeting, but he did not recall whether that meeting took place at Mr. Cullen's home or his own.

Around the middle of May 2008, defendants began excavation of the Hammersmith lot, and commenced construction on the foundation between June and July 2008. During this time frame, Mr. Tarini and Mr. St. Amand decided upon design changes that caused the foundation to extend beyond the Homesite Building Area. Mr. Tarini testified that he considered discussing these changes with plaintiff, but decided not to.

Mr. Cullen testified that after work began on the foundation, he was unaware of the extent and size of the structure because his view of the foundation was blocked by large mounds of dirt on the Hammersmith lot. At trial, however, defendants introduced photographs depicting the building site from August 2008 through

the 4,500 square-foot limit, as well as a height

in excess of the thirty-foot limit.

November 2008, which showed no piles of dirt obstructing the view from plaintiff's property. The plaintiff further testified that it was not until November 2008, after defendants began adding framing on the foundation, that plaintiff first observed the extent of the construction and became concerned about the size and scope of the building.

In November 2008, plaintiff telephoned Mr. Tarini, expressing concern about the size and location of the building, and asking for building plans to determine whether the building complied with the declaration. The plaintiff testified that Mr. Tarini agreed to provide the building plans, but that plaintiff did not immediately receive the plans as requested. The parties then exchanged e-mails in early December 2008, with plaintiff again requesting building plans or, in the alternative, permission to conduct a land survey. Mr. Tarini responded, saying that he already had sent the building plans, but that if plaintiff had not received them, plaintiff could conduct a land survey. After this communication, Mr. Tarini sent building plans, but plaintiff testified that they were insufficient because they were "not * * * working drawing[s] showing actual measurements." After a survey was completed at plaintiff's request, plaintiff concluded that the building under construction violated the terms of the declaration.[6]

On December 24, 2008, Mr. Cullen filed an appeal to the Newport Zoning Board of Review from the issuance of defendants' building permit. According to plaintiff, the building permit was "stayed" as a result of the appeal.

On February 11, 2009, plaintiff filed a complaint in Superior Court seeking relief with respect to defendants' disregard of the restrictions contained in the declaration. Among other relief, plaintiff sought preliminary and mandatory injunctions enjoining defendants from continuing construction on the Hammersmith lot, to remove all construction and equipment from the Open Space Maintenance and View Easement areas, and to reconstruct the residence dwelling within the Homesite Building Area in conformity with the declaration. The Superior Court entered a preliminary injunction on March 4, 2009, ordering defendants to "limit their further construction work on the residence structure * * * to closing in the building envelope." The injunction explicitly stated that defendants "shall conduct any further work * * * at their sole risk, and subject to any further order or judgment of this Court regarding removal, deconstruction, or modification of all or any part" of the structure. As of the date of the preliminary injunction, defendants had spent approximately $1.25 million on construction of the home.

A nonjury trial began on May 11, 2009, closing arguments were heard on May 28, 2009, and detailed memoranda were submitted by the parties. At trial, plaintiff testified on his own behalf and presented the testimonies of defendants' home designer and general contractor, Mr. St. Amand, neighbor Christopher Pell, and plaintiff's surveyor, Wesley Grant III. The defendants presented as witnesses defendant Mr. Tarini, Mr. St. Amand, Mr. Tarini's business associate, Edmund Craig, and Mr. Tarini's surveyor, Roger Lizotte. The

---

**6.** The testimony of plaintiff's surveyor revealed that the highest elevation of the building was over thirty-four feet, the footprint of the ground floor of the property had a total square footage of 4,366 square feet (5,336 square feet including the garage), and the interior space of the structure totaled 12,559 square feet. The surveyor also testified that the structure protruded beyond the Homesite Building Area.

trial justice issued a bench decision on June 26, 2009.

At trial, defendants did not dispute the following violations of the restrictive covenants: (1) the house footprint exceeds the 4,500 square-foot restriction; (2) 8 percent of the roof exceeds the thirty-foot height limit; and (3) 6.5 percent of the structure extends beyond the "no build line" outside the Homesite Building Area. Notwithstanding these admitted violations, defendants argued that plaintiff was guilty of laches, that the doctrine of estoppel precluded the court from enforcing the restrictive covenants, and that plaintiff's conduct constituted a waiver of the restrictive covenants. The defendants also argued that in considering the remedy of injunctive relief in restrictive covenant cases, the court must apply a balancing of the equities.

After carefully weighing the evidence and considering the credibility of the witnesses, the trial justice made the following pertinent factual findings and conclusions. First, the trial justice determined that Mr. Tarini was aware of the size of the proposed structure as it was being designed. On the issue of the disputed meeting between Mr. Tarini and plaintiff that took place some time between August and October 2007, the trial justice found the testimony of plaintiff and Mr. Pell to be more credible than the testimony of Mr. Tarini and Mr. Craig concerning when the meeting occurred and what conversations transpired. The trial justice concluded that the meeting took place in October, rather than August, and that plaintiff did advise Mr. Tarini that he had strictly enforced the declaration's restrictions against the Hammersmith lot's former owners, the Olingers.

The trial justice next concluded that plaintiff received two drawing plans at the October 2007 meeting, but that plaintiff did not review the plans at that time. Further, the trial justice found that the drawing plans did not provide plaintiff with sufficient information to put him on notice that the planned structure violated the declaration. The trial justice also found that plaintiff was not at fault for his inability to determine the size and extent of the structure from his observation of the excavation process that began in May 2008. Rather, the court concluded, plaintiff "acted * * * promptly" when he first became aware that the building under construction on the Hammersmith lot appeared to violate the terms of the declaration.

In his bench decision, the trial justice found the language of the restrictions contained in the declaration to be unambiguous. The trial justice also found that defendants had not acted in good faith and had come to the court with unclean hands. Although the trial justice noted that he could have rejected defendants' equitable affirmative defenses because they came to the court with unclean hands, he went on to address the defenses in light of the evidentiary record. Based on his factual findings, the trial justice concluded that defendants had failed to carry their burden of proof on each of the affirmative defenses of laches, estoppel, and waiver.

On the issue of whether plaintiff was entitled to the requested injunctive relief, the court stated that only in certain circumstances is the court required to balance the equities between the parties. Here, the trial justice concluded, "defendants engaged in actions and conduct with actual notice of the restrictions, [and] proceeded without any express or implied waiver from the plaintiff to build a home that violate[d] unambiguous restrictions." The trial justice further found that plaintiff's intent in recording the declaration's restrictions was to preserve his unob-

structed view of the ocean, and that if the court "were to permit the violation of the restrictive covenants," then plaintiff could "in no way be compensated by remedy at law." Finally, the trial justice concluded that a plaintiff seeking to enforce a restrictive covenant is not required in all cases to establish money damages or other hardship to obtain equitable relief. Based on his factual findings, as well as on this Court's holdings in *Martellini v. Little Angels Day Care, Inc.*, 847 A.2d 838 (R.I. 2004); *Ridgewood Homeowners Association v. Mignacca*, 813 A.2d 965 (R.I.2003) (*Ridgewood*), and *Renaissance Development Corp. v. Universal Properties Group, Inc.*, 821 A.2d 233 (R.I.2003) (*Renaissance*), the trial justice determined that the court was not required to balance the equities in this case.

Judgment was entered in favor of plaintiff on July 1, 2009, from which defendants timely appealed. That judgment permanently enjoined defendants from further violations of the declaration and mandatorily enjoined them to remove all improvements and construction committed by them in violation of the declaration.[7] The trial justice partially granted defendants' motion for stay pending appeal, staying the mandatory injunction requiring defendants to remove all improvements to the open space areas and to reconstruct the encroaching structures in strict compliance with the declaration. On September 16, 2009, this Court granted defendants' motion for stay with respect to other portions of the judgment requiring defendants to take affirmative measures to bring the structures into compliance with the declaration and to pay plaintiff's expenses, including attorneys' fees.

## II

### Standard of Review

"A judgment in a nonjury case will be reversed on appeal [only] when it can be shown that the trial justice misapplied the law, misconceived or overlooked material evidence or made factual findings that were clearly wrong." *Town of West Greenwich v. A. Cardi Realty Associates*, 786 A.2d 354, 357–58 (R.I.2001). Moreover, "[w]hen reviewing a trial justice's issuance of a permanent injunction, this Court will overturn the justice's findings of fact only when they are clearly wrong or when the justice has overlooked or misconceived material evidence." *Board of Governors for Higher Education v. Infinity Construction Services, Inc.*, 795 A.2d 1127, 1129 (R.I.2002).

We accord great weight to a trial justice's determinations of credibility, which, inherently, "are the functions of the trial court and not the functions of the appellate court." *Raheb v. Lemenski*, 115 R.I. 576, 579, 350 A.2d 397, 399 (1976). "[I]f, on review, the record indicates that

---

**7.** The judgment contains five paragraphs providing that defendants are: (1) "permanently enjoined from making or causing to be made any improvements, alterations, or other construction outside" the Homesite Building Area; (2) "mandatorily enjoined to remove all structures, or parts of structures, improvements, plantings, or any other alterations" from the Open Space Maintenance and View Easement areas; (3) mandatorily enjoined to "reconstruct the residence and garage structure * * * to bring it into strict compliance with the Declaration," and required to prepare, within sixty days of the judgment, a detailed plan for the reconstruction of the building, "an executed contract with a general contractor," and "evidence of funds satisfactory to pay the entire cost of reconstruction"; (4) "permanently enjoined from engaging in any activity, construction, or alteration" of the Hammersmith lot "that is not in compliance with the Declaration"; and (5) ordered to "pay plaintiff all expenses, including attorneys' fees, incurred by plaintiff in enforcing the Declaration."

competent evidence supports the trial justice's findings, we shall not substitute our view of the evidence for his [or hers] even though a contrary conclusion could have been reached." *Imperial Casualty and Indemnity Co. v. Bellini,* 888 A.2d 957, 961 (R.I.2005) (quoting *Nisenzon v. Sadowski,* 689 A.2d 1037, 1042 (R.I.1997)). Questions of law, however, are reviewed *de novo. Rhode Island Depositors Economic Protection Corp. v. Bowen Court Associates,* 763 A.2d 1005, 1007 (R.I.2001).

## III

## Discussion

On appeal, defendants raise several arguments. First, they contend that the trial justice misapplied the law of equity in granting injunctive relief in a restrictive covenant case. Specifically, defendants argue that the trial justice improperly granted injunctive relief without proof of irreparable harm to plaintiff. The defendants further argue that the trial justice should have applied a balancing of the equities between the parties, even though defendants admittedly violated the restrictive covenants at issue. According to defendants, by granting a permanent injunction in this case without "balanc[ing] the equities," the trial justice improperly "held that *Ridgewood,* overruled [*Belliveau v. O'Coin,* 557 A.2d 75 (R.I.1989) ], discarding this equitable principle *in toto.*"

The defendants next argue that the trial justice overlooked or misconceived material evidence and made factual findings that were clearly wrong. In particular, defendants maintain that the trial justice misconceived the evidence concerning whether defendants provided plaintiff with adequate notice of their construction plans, and whether plaintiff communicated to defendants his intention to strictly enforce the restrictions contained in the declaration. The defendants also contend that

the trial justice erred in finding that defendants had come to the court with unclean hands, and that the trial justice's rejection of defendants' affirmative defenses of laches and waiver was based on errors of fact.

### A

### The Trial Justice's Factual Findings

■ Before determining whether the trial justice improperly granted injunctive relief without balancing the equities between the parties, we first must consider whether the trial justice misconceived or overlooked material evidence. The defendants contend that the trial justice's decision rejecting their affirmative defenses of laches and waiver was founded upon clear errors of fact and was prejudiced by the trial justice's misperception of the evidence. Factual findings of a trial justice in a nonjury case "are entitled to great weight and will not be disturbed on appeal unless they are clearly wrong or unless the trial justice has overlooked or misconceived material evidence." *South County Sand & Gravel Co. v. Town of Charlestown,* 446 A.2d 1045, 1046 (R.I.1982).

■ The defendants first assert that the trial justice misconceived the evidence in finding that they did not provide meaningful information to plaintiff concerning the planned design of the house to be built on the Hammersmith lot. In particular, defendants contend that the two preliminary drawing plans, delivered to plaintiff at the meeting at plaintiff's home in late 2007, contained sufficient information for plaintiff to ascertain the building's size. To the contrary, the trial justice specifically found that those plans "did not provide [plaintiff] or any other person standing in the shoes of [plaintiff] the information that one would need in order to determine his rights and whether or not his actions were required." Moreover, Mr. Tarini admitted

at trial that he failed to expressly tell plaintiff, at the meeting, that the planned house violated the declaration's restrictions.

The defendants argue that even if the two drawing plans did not provide plaintiff with adequate notice of the size of the planned structure, the trial justice ignored material evidence pertaining to a scaled model of the proposed home, which Mr. Tarini allegedly presented to plaintiff in late 2007. The plaintiff, however, did not recall being shown such a scaled model. The trial justice made no factual findings about whether Mr. Tarini actually delivered the scaled model to plaintiff. It is defendants' position that this model, together with the two drawing plans, sufficed to put plaintiff on notice of the planned dimensions of the structure and that plaintiff impliedly waived his right to enforce the restrictions by failing to take any action. The plaintiff, on the other hand, contends that even if he had been shown the model, it contained no measurements of building dimensions and therefore would not have provided meaningful notice about the size and location of the planned structure.

After carefully reviewing the trial justice's bench decision, we are satisfied that he adequately considered the evidence and properly weighed the credibility of the witnesses in determining that defendants failed to provide plaintiff with meaningful notice of the size and location of the planned design. Although the trial justice did not specifically address the model home, his other findings of fact nonetheless preclude a finding that plaintiff had adequate notice of the planned structure so as to have waived the declaration's restrictions. The trial justice examined the two drawing plans and noted that one consisted merely of a one-dimensional drawing of an "irregular shaped building,"

showing only the building's footprint, with no indication of height, and that the second drawing showed the proposed structure, but lacked any information about the square footage of the building. It is also significant that defendants never expressly asked plaintiff to waive the restrictions. Instead, Mr. Tarini testified that he felt that he "would have to * * * subtly attempt to get [plaintiff's] feedback" concerning plaintiff's reaction to the proposed structure. In fact, the evidence shows that Mr. Tarini was aware that plaintiff would *refuse* any request to waive the restrictive covenants.

■ The defendants next argue that the trial justice misconceived the evidence concerning whether plaintiff timely and appropriately notified defendants of his intention to strictly enforce the restrictive covenants. The defendants dispute the finding that plaintiff informed Mr. Tarini at the meeting in late 2007 about plaintiff's prior refusal of the Olingers' request to waive the restrictions. The trial justice's findings were based upon his determination that the testimony of plaintiff and Mr. Pell was more credible than that of Mr. Tarini. This testimony established that plaintiff gave Mr. Tarini clear notice that he intended to enforce the declaration.

Moreover, the evidence in this case supports the trial justice's conclusion that as soon as plaintiff became aware that the size of the structure might exceed the restrictions, during the framing process in November 2008, plaintiff promptly took appropriate action. The plaintiff immediately requested a survey of the building on the Hammersmith lot and, upon receipt of that survey, filed an appeal of defendants' building permit to the zoning board in December 2008. The plaintiff then filed the present action in the Superior Court in February 2009. The trial justice relied upon competent evidence to support his

conclusions that plaintiff was not guilty of laches and had not waived his right to enforce the declaration. We are not persuaded that the findings of the trial justice were clearly wrong.

■ Next, although the trial justice's rejection of defendants' affirmative defenses was not based upon his determination that defendants acted with unclean hands, defendants nonetheless argue that this determination lacked foundation and that the trial justice's conclusions were prejudiced by this finding. After carefully reviewing the record, we are satisfied that the trial justice's conclusion that defendants came to the court with unclean hands was adequately supported by the evidence adduced at trial. It is undisputed that Mr. Tarini was aware of the restrictions contained in the declaration prior to purchasing the Hammersmith lot. It is also undisputed that the building failed to comply with at least three of those restrictions. Further, there is sufficient evidence in the record to support the trial justice's conclusions that throughout much of the construction process, Mr. Tarini was aware of the violations as well as of the fact that plaintiff intended to enforce the restrictive covenants. The evidence also supports the trial justice's conclusion that Mr. Tarini failed to timely and properly notify plaintiff of the size and dimensions of the building. In consideration of these findings, to which this Court accords great weight, we discern no legitimate cause to disturb the trial justice's determination that defendants acted in bad faith and came to the court with unclean hands.

Finally, defendants argue that the trial justice committed reversible error when he failed to determine whether certain alleged violations of the declaration actually had occurred. Specifically, defendants contend that the trial court's decision left multiple factual controversies unresolved, including whether the ground floor constitutes a "basement" and is therefore excluded from the interior space limitation, and whether certain exterior spaces constitute "terraces," which are excluded from the building footprint. This argument is without merit. At trial, defendants did not dispute that the structure on the Hammersmith lot violated at least three of the declaration's restrictions. It was undisputed that the house footprint exceeded the 4,500 square-foot restriction even when the disputed "terrace" spaces were excluded from the footprint calculation. It was also undisputed that 8 percent of the roof exceeded the thirty-foot height limit, and that 6.5 percent of the structure extended beyond the "no build line" outside the Homesite Building Area. In light of these admitted violations, it was unnecessary for the trial justice to address the remaining factual controversies that defendants alleged.

We are not convinced that the trial justice overlooked or misconceived material evidence. Accordingly, we discern no legitimate cause to disturb the trial justice's determinations of credibility and findings of fact.

## B

### Irreparable Harm

■ Having accepted the factual findings of the trial justice, we now must determine whether injunctive relief was granted properly for plaintiff. First, defendants argue that the trial justice erred by granting injunctive relief without proof that plaintiff would suffer irreparable harm if the injunction were denied. The defendants assert that plaintiff failed to prove not only irreparable harm, but any harm at all.

In his bench decision, the trial justice relied upon this Court's holding in *Ridge-*

*wood.* In *Ridgewood,* 813 A.2d 965, the property owners in a residential subdivision sought to enforce a restrictive covenant prohibiting the keeping of certain animals on residential lots. The trial court denied the requested injunctive relief based on a balancing of the equities between the plaintiffs and the defendants, finding that none of the plaintiffs would experience any hardship from the defendants' continued keeping of a miniature horse on their property. *Id.* at 974. This Court reversed, holding that "[the] plaintiffs seeking to enforce restrictive covenants need not establish money damages or any other hardship to receive equitable relief." *Id.* at 975. Furthermore, this Court stated that establishing a violation of the restrictive covenant "was sufficient for a court to provide the injunctive relief sought." *Id.*

It is undisputed in this case that defendants' development on the Hammersmith lot violated the terms of the declaration. The trial justice found that these violations offended the purpose of the restrictive covenants, which was to preserve for plaintiff "an unobstructed view to nature including the ocean." To allow such violations of the declaration, the trial justice concluded, plaintiff "could * * * in no way be compensated by remedy at law."

The value of a restrictive covenant often is subjective and difficult to evaluate in monetary terms. For this reason, injunctive relief is an appropriate remedy so long as the purpose for which the restrictive covenant was created continues to exist. Restatement (Third) *Property: Servitudes* § 8.3, cmt. *b* at 495–96 (2000). The burdened defendants in this case are no less bound by the restrictive covenants simply because the restrictions are intended for the subjective satisfaction of the benefited owner. Based on this Court's holding in *Ridgewood,* we are satisfied that the trial

justice did not improperly grant injunctive relief without proof of irreparable harm to plaintiff. By so holding, we "effectuate the purposes for which the restriction was established." *Ridgewood,* 813 A.2d at 972 (quoting *Hanley v. Misischi,* 111 R.I. 233, 238, 302 A.2d 79, 82 (1973)).

## C

### Balancing the Equities

The defendants next argue that the trial justice erred by granting injunctive relief for plaintiff without balancing the equities between the parties. Relying on this Court's 1989 decision in *Belliveau,* defendants contend that the trial justice was required to "balance the equities when deciding whether to grant [a] mandatory injunction[ ] in [a] restrictive covenant case[ ], and to deny an injunction if the burden on the defendant is disproportionate to the benefit gained by the plaintiff." The defendants argue that by declining to do so, the trial court improperly interpreted *Ridgewood* as overruling *Belliveau.* We disagree with this contention.

The covenant at issue in *Belliveau* did not restrict use or construction on a parcel of property, but subjected it to a right of first refusal in favor of the defendants, owners of an adjoining parcel. The plaintiffs, owners of the burdened parcel, conveyed it to a corporation, wholly owned by the plaintiffs, for tax purposes. *Belliveau,* 557 A.2d at 76. The defendants sought to strictly enforce the right of first refusal to negate the plaintiffs' sale to the corporation and force the plaintiffs to sell the parcel to the defendants, providing the defendants with an "economic windfall." *Id.* at 76, 80. The Court concluded that the conveyance at issue did not give rise to the defendants' right of first refusal because it "did not amount to a 'significant transfer of ownership or control to an un-

related third party'" and therefore "was not a sale or conveyance within the meaning of the declaration of restrictions." *Id.* at 79 (quoting *Prince v. Elm Investment Co.,* 649 P.2d 820, 823 (Utah 1982)). Under these circumstances, the *Belliveau* Court observed that "it would be inequitable to allow defendants to exercise their right of first refusal." *Id.* The *Belliveau* case is inapposite to the case at bar.

The facts in this case more closely resemble *Martellini* and *Ridgewood,* two cases cited in the trial justice's bench decision. In *Martellini,* 847 A.2d at 840, the plaintiffs sought an injunction to enforce a restrictive covenant prohibiting operation of a day-care center in a residential home. In construing the terms of the restrictive covenant at issue, this Court stated that "we must decide this case on an ad hoc basis because each [restrictive covenant] case presents 'such a wide spectrum of differing circumstances.'" *Id.* at 842 (quoting *Hanley,* 111 R.I. at 238, 302 A.2d at 82). We also noted that when the restriction at issue is unambiguous, this Court "will not * * * seek ambiguity where none exists but rather we will effectuate the purposes for which the restriction was established." *Id.* at 843 (quoting *Ridgewood,* 813 A.2d at 972). This Court held that because the defendants' home day care was a for-profit business, it violated the unambiguous restriction limiting the use to "single family private residence purposes," and the defendants therefore were required to cease operations. *Id.* at 840, 845. In *Martellini,* we did not apply a balancing of the equities between the burden on the defendants in closing their home day-care center and the harm to the plaintiff-neighbors should the day-care center remain in operation. Instead, this Court balanced the public policy of favoring the operation of family day-care homes with the "strong competing public policy of supporting the right of property owners to create and enforce covenants affecting their property." *Id.* at 845.

Consistent with *Martellini,* this Court in *Ridgewood* did not require a balancing of the equities before strictly enforcing a restrictive covenant. In *Ridgewood,* 813 A.2d at 975, discussed *supra,* we held that proof of a violation of a restrictive covenant was sufficient for a court to grant injunctive relief.

In this case, contrary to defendants' argument that the trial court misinterpreted *Ridgewood* as overruling *Belliveau,* the trial court did not hold that it was prohibited from considering the equities in any restrictive covenant case. Instead, the trial court stated that it was "not required to balance the equities," not that it was precluded from doing so. In our opinion, the trial justice's decision correctly interpreted *Ridgewood* in a manner that is not inconsistent with this Court's holding in *Belliveau.*

Lastly, although the trial justice was not required to balance the equities, we must consider whether he erred by declining to weigh the harm to defendants from granting an injunction against the harm to plaintiff from denying injunctive relief. The defendants argue that injunctive relief would be inequitable in this case because it would require dismantling the constructed home, causing defendants to lose their investment of approximately $1.25 million in construction costs, as compared to a lack of substantial harm to plaintiff if injunctive relief is denied.

 The issuance and measure of injunctive relief rest in the sound discretion of the trial justice. *DeNucci v. Pezza,* 114 R.I. 123, 130, 329 A.2d 807, 811 (1974). "[O]n review, '[t]he decision of the trial court made in the exercise of a discretionary power should not be disturbed unless it clearly appears that such discretion has

been improperly exercised or that there has been an abuse thereof.'" *Keystone Elevator Co. v. Johnson & Wales University,* 850 A.2d 912, 921 (R.I.2004) (quoting *Frank N. Gustafson & Sons, Inc. v. Walek,* 599 A.2d 730, 733 (R.I.1991)).

Courts generally have wide discretion in making remedial choices when the equitable enforcement of restrictive covenants is at issue. Restatement (Third) *Property: Servitudes* § 8.3, cmt. *b* at 494–95. This Court clearly has stated that cases involving the enforcement of restrictive covenants must be decided "on an ad hoc basis" depending upon the circumstances of the case. *Martellini,* 847 A.2d at 842. Factors that may be considered in determining the availability of injunctive relief include, *inter alia,* the "purpose of the servitude, the conduct of the parties * * * and the costs and benefits of enforcement to the parties." Restatement (Third) *Property: Servitudes* § 8.3 at 493. The doctrine of balancing the equities is applied in cases when the enforcement of a restriction will disproportionately harm the defendant with little benefit to the plaintiff. *See* 9 Richard R. Powell, *Powell on Real Property,* § 60.10[3] at 60–137–60–138.1 (Michael Allan Wolf ed. 2000). However, the benefit of the doctrine of balancing the equities is generally reserved for the innocent party who proceeds without knowledge or notice that he or she is encroaching upon another's property or property rights. *See id.; see also Renaissance,* 821 A.2d at 239.

In *Renaissance,* 821 A.2d at 234, the plaintiff sought an injunction for removing a retaining wall that the defendants deliberately constructed on a portion of the plaintiff's property that was subject to a cross-easement, when the plaintiff expressly had prohibited such action. The Court observed the general rule that in cases of continuing trespass, the landowner is entitled to a mandatory injunction, except in extraordinary cases when a balancing of the equities may be appropriate. *Id.* at 238. Courts have "refused to balance the equities, and have issued the mandatory injunction without regard to the relative convenience or hardship involved," in circumstances "where the encroachment was intentional, in that defendant proceeded despite notice or warning, or where he [or she] failed to take proper precautions to ascertain the boundary * * *." *Id.* at 238 (quoting *Ariola v. Nigro,* 16 Ill.2d 46, 156 N.E.2d 536, 540 (1959)). The *Renaissance* Court ordered the entry of the injunction as requested by the plaintiff, holding that in that case, when the defendants "knowingly and deliberately encroached on [the plaintiff's] property * * * a balancing of the equities was not appropriate because the hardship to [the] defendants was self-inflicted." *Id.* at 239. In so ordering, the Court noted that the "duty of the courts is to protect rights, and innocent complainants cannot be required to suffer the loss of their rights because of the expense to the wrongdoer." *Id.* at 238 (quoting *Ariola,* 156 N.E.2d at 540).

This Court's rationale in *Renaissance* applies to the case at bar. It is undisputed that the defendants in this case had notice of the declaration. It is also undisputed that the construction on the Hammersmith lot violated at least three of the declaration's restrictions. Mr. Tarini testified that he knew about at least two of the violations at the time of the October 2007 meeting between the parties, before beginning construction, and that he chose to "subtly" wait for the plaintiff to discover the violations rather than directly notify the plaintiff of them. When the plaintiff did not become aware of the violations, the defendants proceeded to spend a substantial amount of money constructing a home that violated the declaration, without any

assurance that the restrictions would not be strictly enforced. Considering that the defendants knowingly and admittedly violated the valid restrictive covenants that applied to their property, and did so without adequately notifying the plaintiff of the violations, we conclude that the trial justice did not abuse his discretion in finding that a balancing of the equities was not appropriate before issuing a permanent injunction.

## IV

### Conclusion

For the reasons set forth in this opinion, the judgment of the Superior Court is affirmed. The record may be remanded to that tribunal.