April 2, 2024

Thomas Knudsen, Trustee, et al.　　:

v.　　　　　　　　　:

Gregory DeJean.　　　　:

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 or Email opinionanalyst@courts.ri.gov of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Thomas Knudsen, Trustee, et al.  :

v.  :

Gregory DeJean.  :

Present:  Goldberg, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Lynch Prata, for the Court.** This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. The defendant, Gregory DeJean (Dr. DeJean), appeals from a final order and judgment of the Superior Court following a nonjury trial, granting the plaintiffs'—Thomas Knudsen (Mr. Knudsen), Trustee, Ciara Ladnier, and Edward Knudsen, Trustees (collectively the plaintiffs)—claims for declaratory and injunctive relief. After considering the parties' written and oral submissions and reviewing the record, we are satisfied that cause has not been shown and that the appeal may be decided at this time without further briefing or argument. For the reasons set forth herein, we affirm the judgment of the Superior Court.

- 1 -

## Facts and Travel

The plaintiffs, Mr. Knudsen and his children, own property (the Knudsen property) located at 315B and 315C West Main Road, Little Compton, Rhode Island.[1] The Knudsen property sits atop a hundred-foot hill which slopes gently down to the Sakonnet River. Doctor DeJean owns property (the DeJean property) located at 315E West Main Road, Little Compton, Rhode Island. The DeJean property borders the Knudsen property; however, the DeJean property sits farther downhill such that the Knudsens have a view of the river over the top of Dr. DeJean's house. In 1989 the parties' predecessors entered into a restrictive covenant, agreeing to certain building height restrictions and land maintenance obligations to preserve the existing views. Since 1989, Dr. DeJean and his late husband, Philip Harper (Mr. Harper), have planted new landscaping and permitted the existing landscaping to grow, diminishing the Knudsens' view.

The Knudsen and DeJean properties were originally part of one forty-acre farm owned by the grandparents of Mr. Harper and Mr. Knudsen's late wife, Laura Knudsen (Ms. Knudsen). Ms. Knudsen and Mr. Harper were cousins. Mr. Knudsen and Dr. DeJean inherited their properties upon the deaths of their respective spouses. Over the generations, the original farm has been divided into smaller parcels to be

---

[1] The plaintiffs own the Knudsen property through two trusts: one for Mr. Knudsen and the other for the children.

passed onto the next generation or sold to third parties. In 1989 there were thirteen parcels: H-1, H-2, H-3, H-4, H-5, H-6, H-7, H-8, B-1 A, B-1 B, B-1 C, B-2 A, and B-2 B. Today, the Knudsen property sits on parcels H-6, B-1 A, and B-1 B, and the DeJean property sits on parcel H-5.

In the 1980s Ms. Knudsen and Mr. Harper began negotiating a restrictive covenant along with Rachel Harper, Mr. Harper's mother, and Bill and Anita Bucknell, Ms. Knudsen's siblings. During the negotiations, Mr. Knudsen acted as a coordinator. He memorialized their conversations into the written document, issued the final document, and acquired all necessary signatures. However, the terms of the covenant were the product of the negotiations between Ms. Knudsen, Mr. Harper, Ms. Harper, Ms. Bucknell, and Mr. Bucknell. These conversations culminated in a restrictive covenant (the agreement) that was signed on June 2, 1989, and recorded in the Little Compton land use records.

The agreement encumbered the "properties," defined by the agreement as parcels "B-1 and 2 and H-1 to 8[,]" with the understanding that although parcels H-1, H-3, and H-4 were owned by nonparties, "[s]aid lots shall become subject to this Agreement if they are repurchased by any party to this Agreement." Paragraph ten of the agreement provides that "[n]o change in the natural condition of the properties (such as cutting of trees, excavations and removal of loam or soil, stone fences, etc.), not necessarily involved in construction approved under Paragraph [seven], shall be

made without the agreement of the owners of the properties." The paragraph clarifies that "[a]side from trees, shrubbery or plants as approved, any other growth of tree, shrub, or plant to a height of six (6) feet or more shall be deemed to be a change in the natural condition requiring approvals referred to above." The paragraph further provides that "[a]ll fields or part thereof, an integral part of the natural condition, * * * shall be maintained in a good and husband-like manner, and in no event shall be mowed not less frequently than once each calendar year." Approvals under paragraph ten were not to "be arbitrarily or unduly withheld[,]" and the explicit "intent of [the] paragraph is that changes in the natural condition of the properties be minimized to preserve existing views from all of the properties."

At the time of the agreement, the landscaping around the DeJean house consisted of several large black pine trees and five spruce trees. The spruce trees stood in a line along the back of the DeJean house, screening it from the Knudsen property. These spruces extended slightly over the ridgeline of the DeJean roof. The black pines were large and extended several feet over the ridgeline. This landscaping afforded the Knudsens a panoramic view of the Sakonnet River over the top of the trees. The view was partially obstructed by the large black pines. However, the black pines did not completely obscure the view because the Knudsens could "see through them" to the water. At the time of the agreement, the Knudsens also had a view of the beach and rock formation at Brown Point, over the pond and fields on

the north side of the DeJean property. There were a small number of shrubs or bushes around the pond in 1988, with some larger bushes north of the pond.

Paragraph fourteen of the agreement contains several limitations on the erection of structures on each parcel. The limitations on parcel H-6—which is located between the Knudsen house and the river—contain a height restriction on any new construction in order "to preserve a view of approximately one-half of the river over the top of any new structure from existing grade on lot B-1, Parcel B * * *." The Knudsens' house is located on B-1 A, just south of parcel B-1 B. However, Mr. Knudsen testified that this provision was intended to apply to parcel B-1 A and that parcel B-1 A was inadvertently omitted from that provision. Paragraph sixteen further provides that "[t]he parties agree to develop an overall landscaping plan for the remaining properties which will serve to screen structures one from the next in a manner which does not constitute further obstruction of views." It is undisputed that the parties never developed such a landscaping plan.

Initially, the landscaping on the DeJean property did not change. However, in the 1990s, Dr. DeJean and Mr. Harper renovated the DeJean property and took out several of the spruce trees. They replaced some of the spruce trees with arborvitae. At the time, Mr. Knudsen was assured that the arborvitae would not grow very tall. By 2001, the black pines had been cut down or destroyed by a beetle infestation, and only two of the original spruce trees remained. When the black pines

died, Dr. DeJean and Mr. Harper planted a white birch, a honey locust, a dogwood, and an oak tree. Mr. Knudsen did not object to the new plantings because most of the trees were under six feet and because his wife was terminally ill, so he was not often at the property.

The new plantings did not trouble Mr. Knudsen until around 2007 or 2011. Mr. Knudsen asked Mr. Harper if he could trim the trees for his daughter's wedding in 2011, but he did not press the issue because Mr. Harper was eighty-one and ailing. After Mr. Harper died in 2012, Dr. DeJean inherited the property. Mr. Knudsen approached Dr. DeJean a couple of times about trimming the oak tree, and Dr. DeJean assented. They also began discussions about amending the agreement. After Dr. DeJean built a new pool, he informed Mr. Knudsen that he wanted to plant a line of trees between the pool and the Knudsen property, to screen it from view. Mr. Knudsen responded that he would not be amenable to a new line of trees, and Dr. DeJean informed Mr. Knudsen that he was no longer interested in amending the agreement. In February of 2016, Mr. Knudsen notified Dr. DeJean that he considered his landscaping to be a violation of the agreement.

At present, the arborvitae and spruce trees screening the DeJean house from the Knudsen property, have grown to a "mass of trees" that splits the Knudsens' view of the Sakonnet River in two. The arborvitae, spruce trees, and birch tree as viewed from the Knudsen property extend past the ridgeline of the DeJean roof,

through the view of the river, to the opposite shoreline. The fields on the DeJean property have grown wild with three willow trees and other wild shrubs obscuring the view of Brown Point. Further, the birch tree has grown significantly, obscuring much of the river view.

On March 9, 2017, Mr. Knudsen filed suit. He subsequently amended his complaint to add his children as plaintiffs. The plaintiffs sought: a declaration of plaintiffs' right, title, and interest in maintaining the agreement between the parties regarding new landscaping and enjoying water views; and an injunction restraining Dr. DeJean from violating the agreement. The case proceeded to a bench trial. Mr. Knudsen testified to the negotiation of the agreement, the changes to the land since 1989, and his reasons for delaying litigation. Doctor DeJean testified to the conditions of the land and Mr. Knudsen's efforts to enforce the agreement. Sara Bradford, a landscape architect, offered testimony on the differences between the present landscape and the 1989 landscape. Ms. Bradford recommended landscaping changes to restore the land to the natural condition as it existed in 1989. She noted that although the black pines could not be replanted due to the risk of disease and beetle infestation, there were changes that could be made to achieve the same effect as the 1989 landscaping. Specifically, she developed a plan to restore the sparse landscape, emphasizing the open fields around the smaller groups of planted areas.

Thereafter, the trial justice issued his bench decision. The trial justice found that paragraph ten prohibits changes to the natural condition of the properties without the agreement of the owners, but that in this case, there were changes to the natural condition of the land, specifically the growth of trees and vegetation. The trial justice further found that paragraph sixteen contemplates the development of a landscaping plan that does not constitute further obstruction of views, but that the parties never complied with this provision. Nevertheless, the trial justice found that the agreement was ambiguous because although paragraphs seven, ten, fourteen, and sixteen restricted new construction, the building height, changes to the natural condition of the land, and future landscaping, the agreement was silent with respect to the parties' obligations to maintain the trees at a certain height in order to preserve views.

The trial justice determined that the general intent of the agreement was to protect the character of the property. The trial justice therefore found that the agreement provided plaintiffs certain rights to view corridors and that Dr. DeJean was "obligated * * * to maintain the views, vistas, and view corridors existing as of June 2, 1989 * * * specifically and generally to the west, to the southwest, to the northwest looking toward the Sakonnet River from the plaintiffs' property." The trial justice rejected Dr. DeJean's affirmative defense of laches because Mr. Knudsen was not negligent in delaying prosecution given that he delayed

- 8 -

prosecution due to Mr. Harper's failing health. Finding for plaintiffs, the trial justice fashioned a remedy. Having found that the agreement provided plaintiffs with rights to views, vistas, and view corridors of the Sakonnet River, the trial justice accepted Ms. Bradford's unrefuted testimony about the character of the property and the views that existed in 1989. Therefore, the trial justice ordered permanent injunctive relief that would preserve plaintiffs' view corridors as of 1989, relying heavily on Ms. Bradford's recommendations.

Specifically, the trial justice permanently enjoined Dr. DeJean, his assigns, and his successors from:

> "limiting or impairing the plaintiffs' views and vistas and view corridors from the plaintiffs' property and from disregarding vegetation, planting, and trimming obligations arising by virtue of this order, also from disregarding property maintenance obligations arising by virtue of the [c]ourt's order and from disregarding future construction constraints arising by virtue of the [c]ourt's order of relief."

The trial justice further ordered Dr. DeJean to make the following changes to his property.

> "[T]o the north side of [Dr. DeJean's] house * * *:
> "i. Remove the two (2) scrub trees that have grown up along the wall (now overtaking the view of Brown Point);
> "ii. Maintain fields from any future encroachment. Additionally, the fields shall be mowed at least once each year at [Dr. DeJean's] election * * *.
> "iii. Trim the oak tree next to the pool by six (6) feet and maintain at that height;

- 9 -

"iv. Remove the willow tree at the north east corner of the pool enclosure;

"v. Trim all trees, including the birch tree, next to the house to a height no higher than the ridge line of [Dr. DeJean's] house and maintain said trees at that height.

"[T]o the east side of [Dr. DeJean's] house * * *:

"i. Remove all arbor vitae trees;

"ii. Cut and maintain all other trees, shrubs, and other vegetation in this location to a height of not greater than the ridgeline of [Dr. DeJean's] house.

"[T]o the south side of [Dr. DeJean's] house, along the driveway * * *:

"i. Trim, shape and maintain all remaining arbor vitae trees to a height not to exceed the ridgeline of [Dr. DeJean's] house.

"[T]o the south side of [Dr. DeJean's] house, not otherwise along the driveway * * * so as to restore the view corridors of the lower fields * * *:

"i. Remove the two (2) dogwood and crabapple trees;

"ii. Trim and maintain the honey locust tree to a height not to exceed twenty-five (25) feet and to a width of twenty-five (25) feet or less (as described by Plaintiffs' expert at trial);

"iii. In order to restore Plaintiffs' southwest view across the fields to the Sakonnet River, [Dr. DeJean] shall remove certain groups or pine tree shrubs along the lane and replant and maintain any replanting in accordance with the parameters set forth on Exhibit 15 at trial and in accordance with the testimony of Plaintiffs' Expert * * *.

"After motion to conform pleadings under Rule 15(b), [Dr. DeJean] is ordered to:

"i. Cut and/or maintain any and all shrubs and/or small trees to a height of no higher than the ridgeline of [Dr. DeJean's] house;

"ii. Remove the birch tree located on the northerly side of [Dr. DeJean's] house." (Footnotes omitted.)

The cost of the initial trimming and removal of the landscaping was to be allocated fifty-fifty, and the cost of maintenance going forward was to be borne by Dr. DeJean alone. The trial justice further ordered that this continual maintenance was to occur on a yearly basis, unless the parties or their heirs agreed otherwise. Thereafter final judgment was entered for plaintiffs, against Dr. DeJean, on counts I and II of plaintiffs' complaint for declaratory relief.[2] The court stayed its judgment pending appeal, and Dr. DeJean filed a timely notice of appeal. On May 26, 2023, we granted plaintiffs' motion to accelerate and expedite the appeal.

**Standard of Review**

"This Court accords 'great deference to the findings of fact of a trial justice sitting without a jury, and will disturb such findings only when the justice misconceives or overlooks material evidence or otherwise is clearly wrong.'" *Athena Providence Place v. Pare*, 262 A.3d 679, 681 (R.I. 2021) (quoting *Whittemore v. Thompson*, 139 A.3d 530, 540 (R.I. 2016)). "A judgment in a nonjury case will be reversed on appeal when it can be shown that the trial justice misapplied the law."

---

[2] Although the final judgment only specifies that judgment shall enter on count I, the order after trial clarifies that counts I and II of plaintiffs' amended complaint were merged for the purposes of granting relief. Moreover, while final judgment also entered on count III of plaintiffs' complaint and counts I and II of Dr. DeJean's counterclaim, neither party has pressed these claims on appeal and, thus, they are not at present before this Court. *See Tiernan v. Magaziner*, 270 A.3d 25, 33 n.3 (R.I. 2022) (holding that the issues raised in the lower court but not argued on appeal are waived).

*Id.* (brackets omitted) (quoting *E.W. Burman, Inc. v. Bradford Dyeing Association, Inc.*, 220 A.3d 745, 753 (R.I. 2019)). Moreover, "[w]hen reviewing the grant or denial of a permanent injunction, [the Court] will reverse the lower court on appeal only when it can be shown that the trial justice misapplied the law, misconceived or overlooked material evidence or made factual findings that were clearly wrong." *Martin v. Wilson*, 246 A.3d 916, 923 (R.I. 2021) (quoting *JHRW, LLC v. Seaport Studios, Inc.*, 212 A.3d 168, 175 (R.I. 2019)). "The issuance and measure of injunctive relief rest in the sound discretion of the trial justice." *Id.* at 923-24 (quoting *Cullen v. Tarini*, 15 A.3d 968, 981 (R.I. 2011)). "On review, the decision of the trial court made in the exercise of a discretionary power should not be disturbed unless it clearly appears that such discretion has been improperly exercised or that there has been an abuse thereof." *Id.* at 924 (quoting *Cullen*, 15 A.3d at 981). "Questions of law, however, are reviewed *de novo*." *Cullen*, 15 A.3d at 977.

## Discussion

### Ambiguity

Doctor DeJean argues that the trial justice erred by failing to construe the covenant in favor of unrestricted use. Doctor DeJean further argues that the trial justice failed to construe the agreement against the drafter and improperly admitted parol evidence to alter the meaning of paragraph fourteen. The plaintiffs argue that the trial justice did not improperly construe the agreement in favor of a more

restricted use because while he referenced ambiguity, it is apparent that he found the terms of the agreement to be clear and that the only "ambiguity" was in regard to the appropriate remedy for Dr. DeJean's breach. The plaintiffs further argue that any ambiguity in the agreement should not have been construed against Mr. Knudsen because he was not the drafter.

"When the terms of a restrictive covenant are clear and definite, the construction of the covenant is a matter of law for the court." *Belliveau v. O'Coin*, 557 A.2d 75, 77 (R.I. 1989) (quoting *Addison County Automotive, Inc. v. Church*, 481 A.2d 402, 405 (Vt. 1984)). "[A]lthough we may look for guidance from other cases in which restrictive covenants are interpreted, we must decide [each] case on an ad hoc basis because each case presents 'such a wide spectrum of differing circumstances,' * * * and because 'the specific effects of applying restrictions can vary, depending on the land and covenants involved.'" *Martellini v. Little Angels Day Care, Inc.*, 847 A.2d 838, 842-43 (R.I. 2004) (brackets omitted) (quoting *Hanley v. Misischi*, 111 R.I. 233, 238, 302 A.2d 79, 82 (1973); *Ridgewood Homeowners Association v. Mignacca*, 813 A.2d 965, 971 (R.I. 2003)).

"This Court's objective in interpreting restrictive covenants is to achieve the delicate balance in favor of 'the free alienability of land while still respecting the purposes for which the restriction was established.'" *Ridgewood Homeowners Association*, 813 A.2d at 971 (quoting *Gregory v. State Department of Mental*

- 13 -

*Health, Retardation and Hospitals*, 495 A.2d 997, 1000 (R.I. 1985)). "In so interpreting, 'we give the words of a restrictive covenant their plain and ordinary meaning unless a contrary intent is discernible from the face of the instrument.'" *Bruce Pollak v. 217 Indian Avenue, LLC*, 222 A.3d 478, 482 (R.I. 2019) (quoting *Ridgewood Homeowners Association*, 813 A.2d at 971). "[T]he general rule concerning restrictive covenants is that they are to be construed strictly so as to favor an unrestricted use of property, are not to be extended by implication, and if there is ambiguity, it is to be resolved in favor of an unrestricted use." *Emma v. Silvestri*, 101 R.I. 749, 751, 227 A.2d 480, 481 (1967). However, the rule of strict construction "will not be used to destroy the very purpose for which the restriction was established. Proper regard must be had for the intent of the parties." *Hanley*, 111 R.I. at 238, 302 A.2d at 82.

Doctor DeJean's argument that the trial justice erred as a matter of law by failing to interpret an ambiguity in favor of unrestricted use and against the drafter rests on the incorrect assumption that the trial justice found ambiguity in the *terms* of the agreement.[3] Although the trial justice made a finding of ambiguity, it is

---

[3] Dr. DeJean's argument that the trial justice erred by construing the agreement in favor of Mr. Knudsen, the purported drafter, also rests on the improper statement of fact that Mr. Knudsen was the drafter of the agreement. Contrary to his argument, the evidence at trial demonstrated that while Mr. Knudsen participated in negotiating the agreement, the agreement was the result of input from all parties. Further, there was no finding that Mr. Knudsen was the drafter.

- 14 -

apparent that the ambiguity he found was the agreement's failure to provide a remedy to address the parties' current dispute. The trial justice found that the agreement was silent in regard to whether the landscaping on Dr. DeJean's property must be kept at a certain height in order to maintain a view of the Sakonnet River. Reasoning that silence can produce ambiguity and looking to the intent of the agreement, the trial justice determined that the agreement provided plaintiff with the right to certain view corridors. The trial justice then unitized his interpretation of the agreement as providing plaintiffs with these rights in order to fashion a permanent injunction as a remedy.

However, in reading the individual provisions of the agreement, the trial justice found them quite clear. He specifically found that paragraph ten prohibits changes to the natural condition of the land without the approval of the property owners and that "here, there's a change to the natural condition of the property subject to this lawsuit, specifically the growth of trees and vegetation as well as some construction in the pool area." Doctor DeJean nevertheless asserts that the trial justice incorrectly interpreted paragraph ten as restricting existing landscaping on the DeJean property because under either the doctrine of *noscitur a sociis* or *ejusdem generis*, the specific examples following the phrase "change in the natural condition of the properties" should be read as limiting the preceding phrase. Therefore, Dr. DeJean argues that changes in the natural condition should be limited to instances

- 15 -

similar to the removal of trees, soil, loam, or stone fences, rather than encompassing changes to the existing landscaping.[4]  In response, plaintiffs argue that the trial justice properly reviewed the language of paragraphs ten, fourteen, and sixteen of the restrictive covenant and found that Dr. DeJean had violated those provisions. They argue that the existing trees, fields, stone wall, and land topography are unambiguously part of the land's natural condition under the restrictive covenant.

Paragraph ten provides that "[n]o change in the natural condition of the properties (such as cutting of trees, excavations and removal of loam or soil, stone fences, etc.) * * * shall be made without the agreement of the owners of the properties."  The use of the term "etc." indicates that the list of examples following the phrase "change in the natural condition of the properties" was not intended to be exclusive but rather explanatory. *See* Black's Law Dictionary 694 (11th ed. 2019) ("The term usu[ally] indicates additional, unspecified items in a series.").  Paragraph ten provides additional examples to clarify the meaning of the phrase by noting that "[a]ll fields" were "an integral part of the natural condition" and that "any other

_____

[4] At oral argument, Dr. DeJean also made the unsupported assertion that paragraph ten of the agreement only applied to the undeveloped parcels and did not apply to the DeJean property.  Such a contention has no support in the plain language of the agreement, which clearly prohibits "change[s] in the natural condition of the *properties* * * *."  (Emphasis added.)  The term "properties" is defined by the agreement as "all Bucknell properties and Harper properties identified as B-1 and 2 and H-1 to 8 * * *."  Accordingly, the prohibition on changes to the natural condition of the "properties" clearly applies to the DeJean property, located on parcel H-5.

- 16 -

growth of tree, shrub, or plant to a height of six (6) feet or more shall be deemed to be a change in the natural condition requiring approvals * * *." Accordingly, the examples listed in paragraph ten plainly indicate that the trees, shrubs, plants, fields, loam, soil, and stone fences were part of the "natural condition" of the properties. Moreover, the clear intent of the restrictive covenant was to "preserve existing views from all of the properties" as of the signing of the agreement in 1989. Therefore, changes to these conditions, including the growth of the fields, shrubs, plants, and trees, without approval of the property owners are unambiguously prohibited by the agreement. Accordingly, we affirm the trial justice's finding that Dr. DeJean violated paragraph ten of the restrictive covenant by permitting the unbridled growth of his trees and vegetation without the approval of the property owners.[5]

**Remedy**

Next, Dr. DeJean argues that the trial justice's remedy should be overturned because it gave plaintiffs a better view than they had in 1989. He argues that the trial justice overlooked photographic evidence of the properties because the photographs demonstrated that in 1989 there were several large black pines that exceeded the ridgeline of Dr. DeJean's house and several brush trees along the stone wall. He further contends that the trial justice erred by ordering him to replant

---

[5] Because we find no error in the trial justice's finding that Dr. DeJean violated paragraph *ten*, his argument that the trial justice wrongfully admitted parol evidence to vary the meaning of paragraph *fourteen* is unavailing.

- 17 -

certain species of plants even though it was undisputed that a landscaping plan was never developed. In response, plaintiffs argue that the trial justice did not overlook material evidence in ordering Dr. DeJean to trim his trees to the ridgeline because the trial justice based this finding on the expert testimony that doing so would bring the land in conformity with the character of the property in 1989.

"We have said that 'courts generally have wide discretion in making remedial choices when the equitable enforcement of restrictive covenants is at issue.'" *Bruce Pollak*, 222 A.3d at 482 (brackets omitted) (quoting *Cullen*, 15 A.3d at 982). Therefore, on review, "the decision of the trial court made in the exercise of a discretionary power should not be disturbed unless it clearly appears that such discretion has been improperly exercised or that there has been an abuse thereof." *Cullen*, 15 A.3d at 981-82 (brackets omitted) (quoting *Keystone Elevator Company, Inc. v. Johnson & Wales University*, 850 A.2d 912, 921 (R.I. 2004)). Because the value of a restrictive covenant is subjective and difficult to evaluate in terms of monetary damages, injunctive relief is generally appropriate for the violation of a restrictive covenant. *Id.* at 980.

The trial justice ordered permanent injunctive relief that would preserve plaintiffs' view corridors as of 1989, relying heavily on Ms. Bradford's recommendations as to how the property could be restored to the natural conditions that existed in 1989. The trial justice based his permanent injunction on Ms.

Bradford's testimony that although the landscape could not be returned precisely to how it existed in 1989, her proposed landscaping plan would achieve the same effect. The trial justice took many of her recommendations in ordering that: the small trees and shrubs be trimmed to the ridgeline; certain trees that were not present in 1989 be removed and replaced with other, more appropriate trees; the open fields be maintained; and the large honey locust tree be permitted to grow above the ridgeline, up to twenty-five feet, to give the same "effect" as the previous massive black pines. Having found that Dr. DeJean violated a restrictive covenant requiring him to seek approval before permitting changes to the natural condition of the property, it was well within the trial justice's discretion to order injunctive relief that would give the same effect as the landscape as it existed in 1989. *See Bruce Pollak*, 222 A.3d at 482 (noting that crafting the remedy for the violation of a restrictive covenant is generally within the sound discretion of the trial justice); *Cullen*, 15 A.3d at 980 (holding that injunctive relief is generally appropriate to remedy violations of restrictive covenants). Accordingly, the trial justice did not abuse his discretion in granting injunctive relief.

**Laches**

Doctor DeJean next argues that the trial justice erred by dismissing his affirmative defense of laches because Mr. Knudsen's delay in filing suit in order to maintain family peace was not reasonable. Doctor DeJean further asserts that this

delay prejudiced him because by the time the suit was filed, Mr. Harper was deceased and could no longer offer his testimony on the intent of the restrictive covenant. The plaintiffs argue that the trial justice appropriately rejected Dr. DeJean's laches defense because he found, as a matter of fact, that Mr. Knudsen's reasons for delay were credible.

"A court applying the defense of laches must use a two-part test. First, there must be negligence on the part of the plaintiff that leads to a delay in the prosecution of the case. * * * Second, this delay must prejudice the defendant." *O'Reilly v. Town of Glocester*, 621 A.2d 697, 702 (R.I. 1993). Because the defense of laches is equitable in nature, the application of the defense "rests within the sound discretion of the trial justice." *Mitola v. Providence Public Buildings Authority*, 273 A.3d 618, 630 (R.I. 2022) (quoting *Hazard v. East Hills, Inc.*, 45 A.3d 1262, 1270 (R.I. 2012)). As such, we "will not reverse the trial justice's decision on what constitutes laches on appeal unless it is clearly wrong." *Cigarrilha v. City of Providence*, 64 A.3d 1208, 1214 (R.I. 2013) (quoting *Hazard*, 45 A.3d at 1270).

The trial justice refused to apply laches because he found credible Mr. Knudsen's explanation that he delayed litigation due to the failing health of Mr. Harper, his late wife's cousin. Doctor DeJean has offered no explanation as to why this finding was clearly erroneous. Instead, he simply argues that this explanation was unreasonable. Giving deference to the trial justice's finding that Mr. Knudsen's

delay in filing suit was excused, we determine that there was no error in his dismissal of Dr. DeJean's laches defense. *See Hazard*, 45 A.3d at 1271 ("[L]aches may be invoked when there is an unexplained and inexcusable delay that caused the other party prejudice.") (quoting *Rodriques v. Santos*, 466 A.2d 306, 311 (R.I. 1983)).

## Conclusion

For the foregoing reasons, we affirm the judgment of the Superior Court. The papers shall be returned to the Superior Court.

Chief Justice Suttell and Justice Robinson did not participate.



**STATE OF RHODE ISLAND**

**SUPREME COURT – CLERK'S OFFICE**

Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Thomas Knudsen, Trustee, et al. v. Gregory DeJean. |
| **Case Number** | No. 2023-74-Appeal.<br>(NC 17-114) |
| **Date Opinion Filed** | April 2, 2024 |
| **Justices** | Goldberg, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Erin Lynch Prata |
| **Source of Appeal** | Newport County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice William E. Carnes, Jr. |
| **Attorney(s) on Appeal** | For Plaintiffs:<br><br>Richard S. Humphrey, Esq.<br>For Defendant:<br><br>Jeremiah C. Lynch, III, Esq. |